598 A.2d 180

**Art RICHARDSON**

v.

**STATE of Maryland.**

**No. 144, Sept. Term, 1990.**

Court of Appeals of Maryland.

Nov. 12, 1991.

612

Michael R. Braudes and Nancy S. Forster, Asst. Public Defenders (Stephen E. Harris, Public Defender, all on brief), Baltimore, for Appellant.

Cathleen C. Brockmeyer, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., both on brief), Baltimore, for Appellee.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, McAULIFFE, CHASANOW, KARWACKI and ROBERT M. BELL, JJ.

CHASANOW, Judge.

Appellant Art Richardson was convicted by a jury of first degree premeditated murder, felony murder, first and second degree rape, first and second degree sexual offense, burglary, robbery with a deadly weapon, and use of a handgun in the commission of a crime of violence. Richardson waived his right to be sentenced by a jury and elected to be sentenced by the court. The trial judge, Simpkins, J., sentenced him to death for the first degree murder, two consecutive life sentences for first degree rape and first degree sexual offense, and three consecutive twenty-year sentences for burglary, robbery with a deadly weapon, and use of a handgun in the commission of a crime of violence. The other convictions were merged. The case is before this Court on direct appeal pursuant to Maryland Code (1957, 1987 Repl.Vol.), Article 27, § 414 and Maryland Rule 8–306(c)(1).

Richardson alleges numerous trial and sentencing hearing errors, but we need consider only one contention because it requires reversal and a new trial. That error was in admitting multiple level hearsay statements made by Michael McCoy and Russell Fletcher, which were elicited by the State in the redirect examination of a police detective.

The trial began with the testimony of Amy R. Because she was the victim of multiple sexual assaults, we will protect her identity by not using her surname and by referring to her husband, the homicide victim, only as Steve. Amy testified that on November 14, 1987, she and Steve lived with their infant daughter, Robin, in apartment 702 of the Cedar Towers Apartments in Baltimore County. That evening, Amy took a prescriptive medication to ease her migraine headache; the couple went to bed about 11:30. The sliding glass door to their 7th floor balcony was left open while they slept.

During the night Amy heard a sound and awoke to see a man with a gun standing at the foot of their bed. Steve jumped up and dashed down the hall, the intruder in pursuit. After hearing several gunshots, Amy ran into the kitchen where she tried to phone 911. At that point the intruder grabbed her from behind, held a knife to her throat, and dragged her back to the bedroom. There, the assailant threw Amy onto the bed, put a pillow over her face, hit her twice when she attempted to struggle, and raped her. He then left the apartment through the sliding glass door to the balcony.

A few minutes later, Amy got up and went toward the kitchen. At that time she saw a man coming back into the apartment through the sliding glass door. Amy ran into Robin's room and tried to escape through a window, but the man caught her, dragged her back to the bedroom, blindfolded her, and tied her to the bed with strips torn from the bedsheets. Amy was raped again and forced to perform fellatio on the man, who left her bound and blindfolded on her bed.

Amy heard a sound she recognized as the balcony screen door and thought the man left, but he then "came back again." While the man was in the bedroom, Amy heard Robin's pacifier drop to the floor, and the baby started crying loudly. She pleaded with the man not to hurt her daughter, telling him that if he gave the pacifier back to Robin, the child would go back to sleep. The man apparent-

ly did so, and Robin stopped crying. When the intruder returned to the bedroom, he switched on the television and watched for a while before raping Amy again. After this attack, Amy heard the man rummaging through her purse. Though still blindfolded, she sensed that it was light outside. She could hear traffic noises and told the man that her mother-in-law would be coming over for breakfast. Amy heard her assailant go into the bathroom, run the water, and return to the bedroom apparently with a wet towel; it sounded to her as if he was wiping things throughout the apartment. The man then left, this time through the front door. When Amy managed to get untied and remove her blindfold, she noticed that the clock said 10 a.m. She went to call the police and discovered Steve's body; he had been shot four times.

Amy was obviously traumatized by the incident and, according to her testimony, tried to block it from her mind. She seemed confused and inconsistent in her initial attempts to identify the assailant or assailants. When Amy first spoke to the police, she told them that she believed there were two or three different attackers. Amy described the assailant in the murder and first rape as a black male, late twenties, slim build, muscular, short beard, mustache, wearing a leather cap and gold chain. Amy said the assailant in the second rape stood 5′10″–5′11″ tall and smelled of alcohol and fruit juice. The assailant in the third rape she described as a black male with a bigger build and thicker lips.

While in the laundry room a few days before the attack, Amy was approached by two men who introduced themselves as her new next-door neighbors in apartment 704. She described the first man, whom she later identified as Richardson, as a black male, 5′9″–5′10″, with collar-length hair which he wore in loose curls hanging just below his collar, and wearing several gold chains. She said the second man was a heavyset black male, 5′9″–5′10″ tall. On another occasion about a week before the incident, three different men came out of apartment 704 and got on the elevator with Amy and her daughter. One of the men, who

was later identified as Michael McCoy, she described as 5'10", medium build, muscular with thick eyelashes, and attractive eyes; he started a conversation with her about her daughter.

On November 18, 1987—three days after the rape and murder—police showed Amy a photographic array that included Richardson's picture in the number four position. She chose the photograph in the third position, saying that the profile looked like the man who had shot her husband. Two days later, Amy called the police back because she kept thinking about the number four photograph; she said she recognized his eyes and thought she had seen the man in that photograph on the elevator. She also said she was almost positive that the man she had seen in the laundry room, the man with the loose curls, was the one who had shot her husband but thought photograph number three was this man. In a deposition about six months later, however, Amy said she could not identify anyone she saw in the laundry room as the assailant.

Amy testified at trial that she had come to believe there was only one assailant, even though she had initially indicated that there had been two or three. She identified Richardson as the man who shot her husband and raped her three times. She also identified Richardson as the man with the loose curls whom she had previously seen in the laundry room. Amy came to believe that there was only one perpetrator because she subsequently recalled that on each occasion the assailant wore the same leather cap.

Some of the other evidence at the trial included Amy's testimony that Steve had a drug problem and had purchased and used cocaine in apartment 704. He had given his guitar to someone in that apartment as payment for drugs. Shortly before the murder, however, Steve became actively involved in a drug rehabilitation program and had stopped using illegal drugs.

Special Agent Richard Reems, a forensic serology expert from the F.B.I., testified that several blood and semen

stains found in Amy's apartment were consistent with Richardson's enzymatic blood markers, although they may also have been consistent with those of a significant segment of the general population. A pubic hair found on the door to Robin's bedroom was also examined and found to be "absolutely indistinguishable" from the sample taken from Richardson. Shortly after the murder, Richardson was seen wearing a leather cap similar to the one later described by Amy.

The balconies to apartments 702 and 704 were connected by a storage room with doors on either side. Neither door locked. A knife was found in apartment 704 the morning after the murder; next to the knife was a blood stain that was consistent with Richardson's blood type. Russell Fletcher testified that he, Michael McCoy, Richardson, and some other people were in apartment 704 the evening before the murder, but that he and McCoy left around midnight leaving Richardson in the apartment. The next morning Richardson told him not to go back to the apartment. Fletcher also testified that Richardson said "somebody shouldn't have been fucking with him or something, you know, and I was saying like why, you know, did you do something there or something? He wouldn't really say nothing, you know." At that point the State's Attorney tried to refresh Fletcher's memory with a police report, which was not further identified. Fletcher then testified: "Well, I asked him did he hurt somebody or did he kill somebody or something like that? And he just put his head down; he didn't really say anything." Fletcher also testified that he asked Richardson about his gun, and Richardson said he "threw it away or something, in a sewer or something." There was conflicting testimony about whether the gun owned by Richardson was the same caliber as the murder weapon. Fletcher acknowledged that he and McCoy attempted to fly to New York the morning of the murder and were at the airport when they received a call from Richardson on their beeper. They left the airport to meet Richardson sometime between 8 a.m. and 10 a.m.

Defense counsel attempted to establish that Richardson had an alibi for at least the latter part of Amy's ordeal and also contended that it was McCoy, Fletcher, or a man called "Bam" and not Richardson who shot Steve. There was additional testimony that McCoy carried a handgun and that sperm found in the comforter of Amy's bed was consistent with McCoy's enzymatic semen markers, which, coincidentally were also the same as Steve's. Richardson did not testify.

The multiple level hearsay statements, which we determine constitute reversible error, related to defense counsel's attempt to establish Richardson's whereabouts at about 8 a.m. on the morning of the murder. There was testimony from Detective Philip G. Marll, the primary investigator assigned to the case, that Steve's murder occurred at about 5:30 a.m. and that the rapes ended between 9 a.m. and 10 a.m.

Michael McCoy, who did not testify at Richardson's trial, gave two separate statements to police. One statement was given to Detective Marll on November 27, 1987; the second statement was given to Detective Dominic on August 22, 1988, apparently in Detective Marll's presence. In his first statement, McCoy said that he received a call on his beeper from Richardson at 7 a.m. the morning of the murder, returned Richardson's call, and met with Richardson an hour later. If those times were correct, Richardson could not have been the assailant who was with Amy until between 9 and 10 a.m. In his second statement, given approximately nine months after his first statement, McCoy told police that he had received the call from Richardson at approximately 10:30 a.m. In that statement, McCoy related his conversation with Richardson and also related a conversation he had with Russell Fletcher.

During cross-examination of Detective Marll, defense counsel sought to establish that Richardson could not have been with Amy at 8 a.m. Without objection he questioned Marll about the times that McCoy had said Richardson called and met with him.

Q. Was there a telephone in apartment 704?

A. I'm not sure. I'm not certain. I don't believe there was. In fact, there was not a telephone in apartment 704.

Q. So at 7 o'clock in the morning, McCoy tells you that he's called by Art Richardson. He then calls him back at some unknown number. He meets at 8 o'clock in the morning. Now, Detective, I can understand you can confuse hours, but you believe they can confuse 7 o'clock with 10 o'clock or later?

A. According to the correspondence I have in front of me, it was that Mr. McCoy was contacted by Mr. Richardson at 10:30 a.m. and he had called him at—Art had called him at 10:35, apartment 9D Orlean Street, the residence of Ms. Denise Boston.

Q. Well, let me ask you about this because there's a number of different correspondence here. In your application for statement of charges which you prepared dated February 22nd, 1988, you state 7 a.m. to 8 a.m., Michael was told by Art that I did something wrong. Don't come up to the apartment.

A. That's correct. And that's the information we had at that time. That was with the telephone conversation with Mr. McCoy prior to me having the interview with him on August the 22nd.

Q. And you talked to a Denise Boston, did you not?

A. Yes, sir. I did.

Q. And she claims that she was called at 8 o'clock in the morning. 8 to 9 o'clock in the morning by Art Richardson.

A. Yes, sir.

Q. And you talked to Mr. McCoy, and he claims—now we have two conversations. One is November 27th, 1987 and he claims that he was beeped between 7 a.m. and 8 a.m., does he not?

A. Let me just check that comment with my files.

Q. Detective, I'd be glad to show you mine.

A. I just found it.

Q. Okay. Detective, were you not told first by Denise Boston at 8 o'clock in the morning, then by Mr. McCoy, 7 o'clock to 8 o'clock in the morning, Mr. Richardson called them?

A. Yes, sir. That's correct.

Q. Were you also not told by Mr. Fletcher that he had met—met with, met with Mr. Richardson, Mr. McCoy and himself at 8 o'clock in the morning when this crime was supposedly still going on for another hour or two?

A. That's correct.

Q. And where would this meeting have taken place?

A. In the parking lot of the 1035 building of Orlean Street.

Q. And how far is that from the crime scene?

A. I'd say a good 5, 7, maybe 8 miles away in Baltimore City.

On redirect examination of Detective Marll, the State's Attorney announced his intention to admit the entire statement given by McCoy on August 22, 1988 relying on "the doctrine of verbal completeness." After objection and extensive argument at the bench, the trial judge ruled that the defense attorney opened this up by asking questions about the statement. As a result of this ruling, Detective Marll was permitted to testify.

Q. Now, officer, I'm going to show you probably the same copy. I'm going to show you this and see if you can identify it.

A. Yes, sir. I can.

       \*     \*     \*     \*     \*     \*

Q. I want you to read where it's—out loud starting with Mike and then ending with the word down and then stop. *Read it out loud and make sure you enunciate properly so the jury can hear you.*

A. Yes, sir.

THE COURT: And this is a what, now?

THE WITNESS: This is a typed statement regarding an interview with Mr. Michael McCoy.

DEFENSE ATTORNEY: For the record, objection.

THE COURT: All right.

THE WITNESS: "Mike advised that the next day at approximately 10:30 a.m., Art called him at 10:35 9D Orlean Street and told him, *you don't know me and you never heard of me.* Mike then asked Art what did you do to my apartment? To which Art replied, I can't tell you. I'm on my way down."

STATE'S ATTORNEY: Okay. I want you to start here where it says Mike then advised and stop at the word yeah.

DEFENSE ATTORNEY: Your Honor, objection again, for the record.

THE COURT: Is this part of the same conversation that you discussed with the defense attorney on cross-examination, Officer?

THE WITNESS: Yes, sir.

STATE'S ATTORNEY: This is part of the same conversation with Michael McCoy, is that correct?

A. Yes, sir. It is.

Q. *Okay. Read that out loud and clearly for the ladies and gentlemen of the jury.*

A. "Mike then advised that after a while, Russell [Fletcher] came up to the apartment and told Mike, *Art [Richardson] asked him, what's the worst thing you can do and he, Russell, said kill somebody and Art said yeah.*" (Emphasis added).

In ruling on the admissibility of hearsay evidence, the trial judge must examine the nature of the out-of-court statements, as well as what they are offered to prove. Without objection, defense counsel elicited from Marll that McCoy told Marll that he had a phone call from Richardson at 7 a.m. and met with Richardson at 8 a.m. The purpose of offering McCoy's hearsay was not to establish *what* McCoy heard from Richardson, but was to establish *when* McCoy heard from Richardson.

■ The State argued, and the trial judge held, that Detective Dominic's report was admissible in redirect examination of Detective Marll under the "doctrine of verbal completeness." In *Bowers v. State*, 298 Md. 115, 468 A.2d 101 (1983), this Court discussed the effect of introducing part of a writing or conversation. We quoted from *Feigley v. Balto. Transit Co.*, 211 Md. 1, 10, 124 A.2d 822, 827 (1956), which in turn quotes from 7 J. Wigmore, *Evidence*, § 2113 (1940):

" 'This right of the opponent to put in the remainder is universally conceded, for every kind of utterance without distinction; and the only question can be as to the scope and limits of the right.

The ensuing controversies are in effect concerned merely with drawing the line so that the opponent shall not, under cloak of this conceded right, put in utterances which do not come within its principle and would be otherwise irrelevant and inadmissible. In the definition of the limits of this right, there may be noted three general corollaries of the principle on which the right rests, namely:

(a) *No utterance irrelevant to the issue is receivable;*

(b) *No more of the remainder of the utterance than concerns the same subject, and is explanatory of the first part,* is receivable;

(c) *The remainder* thus received merely *aids in the construction of the utterance as a whole,* and is not in itself testimony.' " (Emphasis in original).

*Bowers*, 298 Md. at 134, 468 A.2d at 111.

*McCormick on Evidence*, § 56 (E. Cleary 3d ed. 1984) explains that the right to introduce the remainder of a writing offered in part by an opponent has some limitations:

"This right is subject to the qualification that where the remainder is incompetent, not merely as to form as in the case of secondary evidence or hearsay, but because of its prejudicial character then the trial judge should exclude if

he finds that the danger of prejudice outweighs the explanatory value."

*Id.* at 146.

Introducing hearsay evidence of the *time* of McCoy's conversation with Richardson does not give the State the absolute right to admit hearsay evidence of the *content* of McCoy's conversation with Richardson, and it clearly does not justify admitting the content of McCoy's conversation with Fletcher.

The issue opened by the defense was the timing of the telephone call and meeting between McCoy and Richardson. The questions were asked and answered without objection by the State. The inculpatory statements allegedly made by Richardson to McCoy and Fletcher did not in any way explain or put into perspective this issue. In addition, the most damaging statements, *i.e.*, those allegedly made by Richardson to Fletcher and then related by Fletcher to McCoy, were clearly not "opened" by the defense.

■ We should also examine the level of hearsay offered by the prosecutor. The defense had questioned Marll about Marll's conversation with McCoy concerning McCoy's conversations with Richardson. In other words, Marll testified to McCoy's statements relating the time of Richardson's admissions. In redirect examination of Detective Marll, the State added one or two additional levels of hearsay. The prosecutor had Detective Marll read Detective Dominic's hearsay report containing McCoy's hearsay statements relating to the content of Richardson's admissions; even more egregious was Marll's reading Detective Dominic's report containing McCoy's hearsay statement relating Fletcher's hearsay statement relating the content of Richardson's admissions.

The State points out that Richardson's statements to McCoy and Fletcher are admissions of a party and, therefore, should be admissible. Richardson's statements may be admissions, but the only way they can get before the jury is through McCoy's inadmissible hearsay statements

made to the police. Richardson had no opportunity to confront or cross-examine McCoy or Fletcher as to whether they had accurately and truthfully recounted Richardson's words. "When one or more hearsay statements are contained within another hearsay statement, each must fall within an exception to the hearsay rule in order to be admissible under that rule. The fact that one of the statements falls within an exception does not mean that it can carry inadmissible hearsay in with it." 6 L. McLain, *Maryland Evidence,* § 805.1 at 483 (1987). We conclude that the trial court erred in allowing Detective Marll to read the hearsay statements contained in Detective Dominic's report, particularly the statements of Russell Fletcher.

■ The next issue is whether we can conclude beyond a reasonable doubt that the erroneous admission of this testimony was harmless and in no way influenced the verdict in this case. *Thomas v. State,* 301 Md. 294, 310, 483 A.2d 6, 14 (1984), *cert. denied,* 470 U.S. 1088, 105 S.Ct. 1856, 85 L.Ed.2d 153 (1985). Given the somewhat tentative nature of Amy's identification and her initial description of two or three different individuals who assaulted her, we cannot conclude beyond a reasonable doubt that the error was harmless. Fletcher did not testify to Richardson's alleged admission despite the prosecutor's attempt to refresh his recollection using a police report. The statement could be considered by the jury as an implied acknowledgment by Richardson that he had killed someone. While there were other inferences that Richardson admitted doing something wrong, this was the only statement where he may have acknowledged killing someone. There is a reasonable possibility that the jury could have concluded that the second and/or third rapes were committed by someone other than the man who committed the first rape and Steve's murder; absent these alleged admissions there might be a reasonable doubt as to whether Richardson was the actual killer or the second or third rapist. The State's Attorney also seemed to regard Richardson's alleged statements to McCoy and Fletcher as important. The bench conference

where he pressed for admissibility of the statements spanned 8 pages of the record, and after being warned by the trial judge that there was no point in getting into something that is going to cause the case to be tried over again, the prosecutor still insisted that "we're entitled to this under the law. He opened the door." The State's Attorney also seemed to highlight the importance of these statements in his redirect examination of Detective Marll, and in his closing argument to the jury, his final comment in summing up the evidence was:

"[y]ou might not understand all the information about the fingerprints that Detective Ostendarp talked about. But one thing that you do understand, the statements made by the defendant to his friends. There's no explanation for these except his guilt."

The pubic hair found on Robin's door, as well as Richardson's admissions that he did something wrong, provide very strong evidence that Richardson was in the apartment and assaulted Amy. But there is at least a reasonable possibility that, if Richardson's alleged admissions to McCoy and Fletcher had been excluded, the jury might have had reasonable doubt as to whether Richardson was the same man who wielded the gun or the knife. The first degree rape and sexual offense convictions might have been based on the gun and knife used by the assailant in the first rape, which occurred immediately after Steve's murder. Because we cannot say beyond a reasonable doubt that the erroneously admitted evidence in no way influenced the verdict on the remaining counts, we must order a new trial on all counts.

JUDGMENTS REVERSED AND CASE REMANDED TO THE CIRCUIT COURT FOR SOMERSET COUNTY FOR NEW TRIAL. COSTS TO BE PAID BY BALTIMORE COUNTY.