769 A.2d 313

John M. CHURCHFIELD

v.

STATE of Maryland.

No. 1345, Sept. Term, 2000.

Court of Special Appeals of Maryland.

April 2, 2001.

670

Amy E. Brennan, Asst. Public Defender (Stephen E. Harris, Public Defender on the brief), Baltimore, for appellant.

Rachel Marblestone Kamins, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore, and David R. Ruark, State's Atty. for Wicomico County, Salisbury, on the brief), for appellee.

Argued before KRAUSER, JOHN J. BISHOP (Ret'd, Specially Assigned), and RAYMOND G. THIEME, Jr. (Ret'd, Specially Assigned), JJ.

RAYMOND G. THIEME, Jr., Judge, Ret'd, Specially Assigned.

Appellant John M. Churchfield was convicted of child abuse, Md.Code (1957, 1996 Repl.Vol., 2000 Cum.Supp.), Art. 27 § 35C, by a jury in the Circuit Court for Wicomico County. The court imposed a fifteen-year sentence, suspending all but seven and one-half years. Churchfield noted a timely appeal and asks:

1. Did the court below err when it restricted cross-examination by excluding certain information about the complainant's sexual activities?

2. Did the court below err when it limited the defense's cross-examination of the social worker who interviewed appellant to exclude certain statements he made shortly before he was arrested?

3. Did the court below err when it admitted into evidence statements made by appellant in reaction to his arrest?

We answer "yes" to the first question and "no" to the second and third questions and explain.

## Facts

Christina Churchfield, age fifteen at the time of the trial, started living with appellant, her father, in December 1996, when her mother, a drug addict who had custody of Christina in Florida, surrendered parental rights. At the time, she was ten years of age. Christina's two brothers, two sisters, and stepmother lived in the family home with Christina and appellant and, at times, other family members would stay there "long term." During one of these times, Christina, who was twelve years of age, became pregnant with the child of her adult half-brother, William Churchfield. After appellant turned his son in, William pleaded guilty to second degree rape and incest, and he is now serving his sentence. Christina gave birth to a daughter on December 2, 1998. She testified that she continued to live with her father after the baby was born, and her parents forced her to place the child for adoption with a relative in a distant state.

Christina testified that appellant's behavior toward her became more and more sexual over time. Inappropriate contact between father and daughter began with wrestling, gradually became touching, and culminated, in January or February of 1999, with vaginal intercourse. The first incident of intercourse occurred while Christina and her father were watching television in the parents' upstairs bedroom while the other children were asleep and Mrs. Churchfield was working.

Christina testified that she and her father had intercourse on more than one occasion, but she could not say how many times it happened. She recalled that the last incident took place during the first week of January 2000.

Christina ran away from home on February 4, 2000. A boy she was dating, Randy Van Hook, met Christina at a Food Lion near her home during the early morning hours and took her to his home. Once she arrived, Christina told Randy's mother that her father had been abusing her, and Mrs. Van Hook called the authorities. A detective and representative of the Department of Social Services interviewed Christina at the Van Hook home later that day.

Jody Holland of the Department of Social Services investigated the allegations against appellant, and she was present when he was arrested on February 7. Ms. Holland testified that, when appellant was handcuffed, he said, referring to Christina, "I'll take care of that bitch when this is over."

Ashley Churchfield, Christina's twelve-year-old half-sister, testified that she was not aware of any unusual activities between her sister and her father. Cora Webster, appellant's mother-in-law, testified that she had lived in the Churchfield home from February 1999 until October 1999 and, likewise, was unaware of any unusual relationship between or inappropriate activities involving father and daughter. She also confirmed that Christina never complained to her about any inappropriate contact or play.

Melissa Churchfield, Christina's stepmother, testified that she had been married to appellant for thirteen years. She also averred that she had not observed any inappropriate contact between her husband and stepdaughter. To the contrary, Mrs. Churchfield opined that Christina could be deceitful and manipulative:

> Sometimes she can tell you what she wants to tell you, you know, to get you to believe what she wants. Sometimes she's truthful, sometimes she is not, you just got to know how she is and her personality to work your way around her sometimes.

On the evening before Christina left, Mrs. Churchfield testified, the girl asked her parents if she could spend the weekend with a friend named Nicky. The Churchfields refused to let her go, because they did not know Nicky or her parents. In fact, the Churchfields "had never heard Nicky's name," and Christina refused to offer an address or a phone number. Mrs. Churchfield testified that Christina "got mad, slammed her bedroom door, and stayed in there the rest of the night." At 4:00 a.m., she checked Christina's room and found that the girl had left the house. She and appellant also found a note, stating, in part, "You won't let me grow up so I am going to do it myself."

Appellant testified that he did not have sexual relations with his daughter. He denied ever touching her inappropriately. Appellant, moreover, testified to ongoing conflict with his daughter during the six months preceding the allegations, including clashes with Christina over boys and dating:

Q: Did you have any type of conflicts, ongoing conflicts with her over any reason?

A: A lot. We had quite a few of them, I mean, the way she dresses and makeup. I didn't believe in wearing makeup or fingernail polish or things like that, and we had big clashes over things like that....

Q: Did you have any other types of conflicts with Christina?

A: With the two boys, yes.

Q: Could you tell the jury, please, what the nature of that conflict was?

A: Well, she was—more or less both boys were more or less trying to see her and all. And we told her she could not see these boys anymore.

Q: Why did you tell her that?

A: Because we felt the boys were playing her.

Q: What exactly do you mean by that?

A: Both the boys we figured was after one thing from her. We were trying to protect her.

Q: Did you have any reason for thinking that?

A: Well, she used to brag about having sexual intercourse—

[PROSECUTOR]: Objection, Your Honor.

[THE COURT]: Sustained.

Q: Mr. Churchfield, what was Christina's reaction when you made it clear to her that you didn't want her to see these boys?

A: She was upset about it.

Appellant also corroborated his wife's testimony about the night before Christina ran away. As for his remarks to Jody Holland as he was being arrested, appellant explained as follows:

Q: There's been testimony that you when you were placed under arrest you said I'll fix that bitch when this is over with?

A: Yes, sir.

Q: Did you say that?

A: Yes, sir, I was very upset for being arrested for something I hadn't done.

Q: What did you mean by that?

A: It was just a phrase. I mean, she had done so many things in the past, it was just one more thing she had done, you know. I was more majorly upset about it because I have never been arrested before.

Additional facts will be supplied, as needed, in the discussion.

## Discussion

### I

Evidence of the ongoing conflict between appellant and his daughter was pivotal to the defense strategy in the case *sub judice.* Appellant contends that Christina falsely accused him of having sexual intercourse with her because, tired of his restrictions on her activities, she wanted him out of her way. She found him to be overly protective, particularly concerning

her budding interest in young men and her desire to present herself as though she were an adult woman. Based upon her earlier experience with her half-brother, Christina knew that social workers and police officers take seriously accusations of sexual abuse. Thus, in order to rid herself of her meddling father—the defense hoped jurors would infer—Christina fabricated a story of abuse. Defense counsel managed to elicit at least some evidence to support his theory; however, when he sought to examine Christina and other witnesses regarding key areas of the family conflict, the State objected, and the court upheld those objections. In finding that the desired testimony, which related to the nature of Christina's relationships with her two boyfriends, was irrelevant and prejudicial, the court erred.

## A

The conflict between father and daughter centered around whether Christina was sexually active with two male schoolmates, as her parents reasonably suspected. Before trial, the prosecution moved to limit Christina's testimony regarding her prior sexual relationships pursuant to the Rape Shield Statute,[1] which applied for one of the original charges.[2] After

---

1. Md.Code (1957, 1991 Repl.Vol., 2000 Cum.Supp.) Art. 27 § 461A; *see also* Md. Rule 5–412. The Rape Shield Statute makes inadmissible "[e]vidence relating to a victim's reputation for chastity and opinion evidence relating to a victim's chastity … in any prosecution for commission of a rape, sexual offense in the first or second degree, or attempted rape or attempted sexual offense in the first or second degree," unless such evidence

 is relevant and is material to a fact in issue in the case and that its inflammatory or prejudicial nature does not outweigh its probative value, and if the evidence is:

 (1) Evidence of the victim's past sexual conduct with the defendant; or

 (2) Evidence of specific instances of sexual activity showing the source or origin of semen, pregnancy, disease, or trauma; or

 (3) Evidence which supports a claim that the victim has an ulterior motive in accusing the defendant of the crime; or

 (4) Evidence offered for the purpose of impeachment when the prosecutor puts the victim's prior sexual conduct in issue.

 § 461A(a).

2. The original charges were second degree rape, incest, and second degree assault.

three of four original charges were *nol prossed,* and the State decided to try appellant on the child abuse charge alone, the court determined the admissibility of such evidence, and the following colloquy took place:

DEFENSE COUNSEL: Judge, it's my understanding from Mr. Churchfield that the argument about Christina's contact with these two boys had been ongoing for at least a week prior to her running away. The running away occurred the morning Friday, February 4, 2000.

THE COURT: I'm sorry, Friday—

DEFENSE COUNSEL: Friday, February 4, 2000.

The complaint, as reflected in the Social Services records, the first complaint of sexual abuse occurred sometime during the day of Thursday, February 3, 2000.

But I would proffer that the argument about her conduct with these two boys having sexual contact with them at the same time occurred for about a week prior to that. It is also my understanding that on the 4th, the 3rd or the 4th she wanted to go spend the night at the friend's house, the parents, Mr. and Mrs. Churchfield, were not willing to let her. So for that reason that appeared to be the catalyst that caused her to run away.

Judge, I make that proffer again with the understanding that I don't believe the Rape Shield Statute applies any longer. I just leave that with the Court.

THE COURT: Okay.

PROSECUTOR: Well, Your Honor, as I stated before, even though the Rape Shield Statute doesn't apply, the arguments of probative versus prejudicial always applies as does relevancy. And I think that saying they are arguing about her being sexually active with two boys, there's no way for a father to know if that is true or not. It is highly prejudicial, it's trying to make the victim look like some promiscuous

tramp, in light of the fact that it's a sexual allegation that we have here.

And so I think that even if it were true, I think it would be highly prejudicial. But that's even saying it's true, which I don't think there's any basis for believing that it is. It's a very convenient argument and I think it's going to do nothing but sway the jury to look at the victim in a very unfavorable light.

I don't see there's any reason why it couldn't be said that he was arguing with Christina, I don't know if there's some way to qualify what they were arguing and I think she would admit that they had a very bad relationship from the beginning. But without bringing out the sexual aspects of it along those lines. I think that would be—it really doesn't matter what they were arguing over, it's the fact that they were arguing is what their defense would be. She's mad because they are arguing and she's going to get him in trouble. So that would be my response.

THE COURT: All right. Why wouldn't limiting testimony simply to the fact that there was an ongoing argument between them about her relationships with others?

DEFENDANT: But the boys—

DEFENSE COUNSEL: Shh.

Judge, I think the jury needs to see the whole picture. I mean, obviously [the prosecutor] makes the argument prejudicial versus probative. I think that is misplaced because typically the standard is whether it prejudices the defense. I guess [the prosecutor's] argument is that it somehow prejudices her victim.

The jury needs to see the whole picture of what's going on here. The girl is aware of what happens when she says rape by prior experience. She has an argument with her father about her conduct with boys, wants to spend the night out of the house, the father won't let her so she runs away and makes this allegation. I think the jury needs to see the whole picture.

THE COURT: Well, assuming all that is true, what's the father in a position to do rather than speculate as to the nature of her relationship with the boys?

DEFENSE COUNSEL: Judge, I think the parents knew there was sexual activity. I mean, I don't think there was any question about that. I don't believe there was speculation.

THE COURT: What's your proffer about it?

DEFENSE COUNSEL: That the parents were aware.

Is that accurate? You were aware there was a sexual relationship going on?

DEFENDANT: Yes, on the phone from the boys.

DEFENSE COUNSEL: The parents have provided me with a letter from one of them in which the boy says that I know you're also having sex with the other boy.

PROSECUTOR: What does that have to do with the price of tea?

THE COURT: Yes.

DEFENSE COUNSEL: Well, it makes the parents aware of what's going on. It's obviously a struggle that's going on within the family at that point. The father says you can't go out, and this is our theory, this is how the child reacts by making this allegation against the father.

There's also testimony which I intended to introduce today that the girl made the statement to her sister saying once daddy's arrested I'm going to go live with Garrett's family, Garrett being one of the two boys.

THE COURT: Well, it seems to me that you can get in everything that you want to get in in terms of the rocky nature of the relationship without, you know, the fact that maybe they got a copy of a letter from a boy to her. I don't know why that would be admissible.

If you want to show the nature of the relationship, the rocky nature of the relationship, and the fact that they are arguing about whether she can go stay at a boy's house, all of that seems to be appropriate, but you really haven't told

me anything that would indicate that the father has any knowledge, other than based on inadmissible sources or speculation as to the true nature of her relationship with these other boys.

And consequently it seems to me that that would not be admissible based on what you have told me in our proffer.

All right?

Okay. Are you ready for the jury?

During Christina's cross-examination, the defense sought to elicit testimony relevant to the conflict between the girl and her father, but the court suppressed it:

Q: What was your relationship with Mr. Mancuso [one of Christina's two alleged boyfriends]?

[PROSECUTOR]: Objection, Your Honor. Relevance.

THE COURT: Sustained.

[DEFENSE COUNSEL]: Well, Judge, I think the jury is entitled to know how close they were.

THE COURT: I think she said he was a close friend.

[DEFENSE COUNSEL]: Well, may I, Your Honor, pursue this?

THE COURT: No, I sustained the objection.

[DEFENSE COUNSEL]: Did you, in fact, have a romantic relationship with Mr. Mancuso?

[PROSECUTOR]: Objection, Your Honor.

THE COURT: Sustained.

As his cross-examination of Christina ended, defense counsel again proffered:

And also I'd like to ask her about the level of her involvement, her romantic involvement with Mr. Van Hook and Mr. Mancuso. And it's my understanding that you have ordered me not to do so.

THE COURT: Correct.

DEFENSE COUNSEL: Thank you.

By withholding from the jury Christina's own testimony on these matters, and presumably the testimony of the two boys

as well, the court denied jurors the opportunity to judge for themselves Christina's credibility, especially about her sexual activities, and the extent to which she would go to evade parental restrictions in that area. Likewise, it denied jurors the chance to evaluate appellant's credibility regarding his claims about his daughter's motives.

## B

In reviewing the trial court's evidentiary rulings, we recognize that the court has broad discretion in the conduct of trials, and we will not disturb that exercise of discretion unless the court has clearly abused it. *State v. Hawkins,* 326 Md. 270, 277, 604 A.2d 489 (1992). "Generally speaking, the scope of examination of witnesses at trial is left largely to the discretion of the trial judge and no error will be recognized unless there is a clear abuse of such discretion." *Oken v. State,* 327 Md. 628, 669, 612 A.2d 258 (1992); *see also White v. State,* 324 Md. 626, 637, 598 A.2d 187 (1991) (determinations on relevance will not be reversed absent a clear showing of abuse of discretion). Yet, the discretion we afford the trial court is hardly unlimited, and the most powerful delimiters of the trial court's discretion are the constitutional ones.

In *Marshall v. State,* 346 Md. 186, 192–99, 695 A.2d 184 (1997), the Court of Appeals examined at length the tension between the trial court's discretion to limit cross-examination and the constitutional strictures guaranteeing a fair trial. The right of the accused to impeach witnesses against him by cross-examination, the Court explained, has its roots in the Confrontation Clause of the Sixth Amendment,[3] and likewise in Article 21 of the Maryland Declaration of Rights.[4] *Id.* at 192, 695 A.2d 184. The right to be faced by

---

3. The Sixth Amendment states in relevant part:
 In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him....
 U.S. Const. amend vi.

4. Article 21 of the Maryland Declaration of Rights states in relevant part:

one's accusers exceeds the sparely worded guarantee expressed by the Confrontation Clause. *Id.* (citing *Davis v. Alaska,* 415 U.S. 308, 315, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347, 353 (1974)). It encompasses, in addition, the right to attack that accuser's credibility in court " 'by means of cross-examination directed toward revealing possible biases, prejudices, or ulterior motives of the witness as they may relate directly to issues or personalities in the case at hand.' " *Id.* (quoting *Davis,* 415 U.S. at 316, 94 S.Ct. at 1110, 39 L.Ed.2d at 354); *see also Ebb v. State,* 341 Md. 578, 587, 671 A.2d 974 (1996). Indeed, as the Supreme Court recognized in *Davis* and our colleagues reiterated in *Marshall,* " 'the exposure of a witness' motivation in testifying is a proper and important function of cross-examination.' " *Marshall,* 346 Md. at 192–93, 695 A.2d 184 (quoting *Davis,* 415 U.S. at 316–17, 94 S.Ct. at 1110, 39 L.Ed.2d at 354); *see also Smallwood v. State,* 320 Md. 300, 306, 577 A.2d 356 (1990). In his treatise on Maryland's law of evidence, the Chief Judge of this Court observed that such cross-examination of witnesses is "the most important impeachment technique because 'even an untruthful man will not usually lie without a motive.' " Joseph F. Murphy, Jr., *Maryland Evidence Handbook* § 1302(E) (2d ed.1993) (quoting *Gates v. Kelley,* 15 N.D. 639, 110 N.W. 770, 773 (1907)), *quoted in Marshall,* 346 Md. at 193, 695 A.2d 184.

To be sure, the right of cross-examination may be limited by the trial court. *Marshall,* 346 at 193, 695 A.2d 184 (citing *Delaware v. Van Arsdall,* 475 U.S. 673, 679, 106 S.Ct. 1431, 1435, 89 L.Ed.2d 674, 683 (1986); *Smallwood,* 320 Md. at 307, 577 A.2d 356). The trial court, for example, may "impose reasonable limits on cross-examination to protect witness safety or to prevent harassment, prejudice, confusion of the issues, or inquiry that is repetitive or marginally relevant," *id.,* especially as collateral matters are concerned. *Smallwood,* 320 Md. at 308, 577 A.2d 356. Such limits, however, may not

---

[I]n all criminal prosecutions, every man hath a right ... to be confronted with the witnesses against him....
Md. Const. Decl. of Rights art. 21.

trample the constitutional rights of the accused, and the trial court's discretion begins only after " 'constitutionally required threshold level of inquiry has been afforded the defendant' to satisfy the Sixth Amendment." *Marshall,* 346 Md. at 193, 695 A.2d 184 (citing cases including *Smallwood,* 320 Md. at 307, 577 A.2d 356; *Brown v. State,* 74 Md.App. 414, 419, 538 A.2d 317 (1988)). The Sixth Amendment requires that the defense be " 'permitted to expose the jury to the facts from which jurors, as the sole triers of fact and of credibility, could appropriately draw inferences relating to the reliability of the witness.' " *Id.* (quoting *Davis,* 415 U.S. at 318, 94 S.Ct. at 1111, 39 L.Ed.2d at 355; *United States v. Restivo,* 8 F.3d 274, 278 (5th Cir.1993)). To determine whether the trial court abused its discretion in limiting the cross-examination of the State's witnesses, " 'the test is whether the jury was already in possession of sufficient information to make a discriminating appraisal of the particular witness's possible motives for testifying falsely in favor of the government.' " *Id.* (quoting *United States v. Christian,* 786 F.2d 203, 213 (6th Cir.1986)); *see also Smallwood,* 320 Md. at 307, 577 A.2d 356 ("one should be allowed to cross-examine in order to determine the reasons for acts or statements referred to on direct examination").

Expounding upon the latter point, appellant points to *Smallwood,* in which the trial court refused to allow cross-examination of a witness, defendant Smallwood's former girlfriend, Lomax, as to the outcome of two separate assault charges that she had filed against him. Smallwood was convicted of robbery after Lomax testified that she had regularly loaned him her car, which was used during the crime, and that Smallwood had given her some of the stolen merchandise. *Smallwood,* 320 Md. at 302, 577 A.2d 356. The trial court allowed questioning of Lomax regarding the assault charges, but prohibited testimony regarding Smallwood's acquittal for those charges. The court reasoned that the *disposition* of charges was irrelevant to his guilt or innocence of the robbery charges and only the *filing* of charges went to the witness's prejudice. The Court of Appeals reversed, reasoning that Smallwood had successfully demonstrated that Lomax could have been "using

this opportunity to finally punish him for what she felt were unpunished wrongs committed against her in the past." *Id.* at 309, 577 A.2d 356. Quoting from our opinion in *Brown,* 74 Md.App. at 420–21, 538 A.2d 317, Judge Cole wrote:

For purposes of cross-examination of a prosecution witness *in order to show bias or motive,*

[T]he crux of the inquiry insofar as its relevance is concerned, is the witness's state of mind. What is essential to the preservation of the right to cross-examine is that the interrogator be permitted to probe into whether the witness is acting under a hope or belief of leniency or reward.

To the last sentence in the quote we would add "or out of spite or vindictiveness."

In addition, the form and nature of the questions asked by Petitioner were entirely proper. In [*State v.*] *Cox*[, 298 Md. 173, [184,] 468 A.2d 319 (1983) ], we concluded

that the inquiry had substantial probative force and there was no indication that defense counsel was harassing the witness by asking an unfounded question or seeking primarily to embarrass the witness.

*The same holds true for the questions in the instant case which went to the "very heart" of Ms. Lomax's bias.*

*Smallwood,* 320 Md. at 309–10, 577 A.2d 356 (citations omitted) (second emphasis added).

## C

■ Here, the State would support the trial court's view that sufficient information establishing a struggle between Christina and her father is already present in the record and that appellant's efforts to elicit testimony regarding Christina's sexual activities "stray into collateral matters." *Smallwood,* 320 Md. at 308, 577 A.2d 356. The *fact* of antagonism between father and daughter, the State argues, was relevant and probative of Christina's motive; the *source* of antagonism, it avers, was not. The State dismisses the concerns raised by the *Smallwood* Court—that the jury

should be made aware when the testifying witness might be acting "out of spite or vindictiveness"—by claiming that Churchfield *had* been given

> ample opportunity to develop whether the victim had an ulterior motive in accusing him of abusing her. . . . Defense counsel elicited from the victim that she was angry at her father for making her give away her baby, and that she had been upset the night before she made her accusation against him over his decision not to allow her to spend the night at a friend's house. Defense counsel also extensively questioned the victim's stepmother and Churchfield himself about various conflicts between Churchfield and the victim. Notably, Churchfield testified that the victim was angry at him because he had forbidden her to date two boys whom he believed were "after one thing from her." Thus, the defense accomplished its objective of establishing an "ongoing argument" between Churchfield and his daughter regarding her involvement with two boys, without the gratuitous reference to sexual activity. (citations omitted)

Likewise, in *Smallwood*, the trial court allowed testimony that Lomax had filed assault charges against the defendant but refused to allow testimony about his acquittal. If the testimony Lomax should have been allowed to give, regarding alleged crimes that were unrelated to the issues before the court, "went to the 'very heart' of [her] bias," the suppressed testimony in the instant case strikes at the heart of Christina's bias as well. It is more likely than the testimony suppressed in *Smallwood* to show her motive or bias. At its very roots, the case *sub judice* is *about* sexual activity, as was the conflict between father and daughter. The evidence, in its most condensed form, comprises Christina's allegations, including what she told boyfriends, another parent, and investigators, against the word of her father. If the defense had been allowed to explore the full panoply of issues related to Christina's relationships with the two boyfriends and her running disagreement with her father, the jury may have been able to assess more readily whether she had a propensity to lie about sex. For this reason, the suppressed line of ques-

tioning was relevant under the standard of Md. Rule 5–401,[5] and the trial court erred in finding otherwise.

The State also argues that, even if the evidence were relevant, its probative value would be outweighed by its potential for unfair prejudice, and, thus, it would be inadmissible under Md. Rule 5–403.[6] As with the determination for relevance, the trial court enjoys broad discretion over the admission or exclusion of evidence and the scope of cross-examination when it determines that the proffered testimony presents "the possibility of embarrassment to or harassment of the witness and the possibility of undue delay or confusion of the issues," *Ebb v. State,* 341 Md. 578, 588, 671 A.2d 974 (1996), especially if that testimony is only marginally relevant. *Id.* at 590, 671 A.2d 974; *see also Marshall,* 346 Md. at 193, 695 A.2d 184 ("The trial judge retains discretion to impose reasonable limits on cross-examination to protect witness safety or to prevent harassment, prejudice, confusion of the issues, or inquiry that is repetitive or marginally relevant.") (citing *Van Arsdall,* 475 U.S. at 679, 106 S.Ct. at 1435, 89 L.Ed.2d at 683; *Smallwood,* 320 Md. at 307, 577 A.2d 356). The State contends that "[t]he only apparent purpose for offering the evidence was to create in the jury's minds a distasteful impression of a fifteen-year-old victim by portraying her as sexually precocious," and the inflammatory nature of the testimony would have outweighed its probative value.

We disagree, and we hold that the trial court clearly abused its discretion. For the reasons set forth *supra,* the suppressed testimony was more than marginally relevant and

---

**5.** Md. Rule 5–401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

**6.** Md. Rule 5–403 states that relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

goes to the heart of the accusations against appellant.[7] We acknowledge that Christina and perhaps other witnesses, such as any former boyfriends called to testify, will likely find this line of questioning embarrassing. We also acknowledge that Christina has already suffered greatly in her fifteen years, especially at the hands of adults who should have protected her. Nevertheless, appellant has proffered more than a scintilla of proof that his daughter's charges are motivated not by actual events but instead by her desire to evade parental supervision. His reputation and, indeed, his liberty, and not that of his daughter, hang in the balance, and he should be allowed to impeach fully her testimony.

### D

Having concluded that the court below erred when it restricted questioning as to Christina's sexual behavior, we now determine whether such error was harmful beyond a reasonable doubt, " 'assuming that the damaging potential of the cross-examination [was] fully realized.' " *Smallwood*, 320 Md. at 308, 577 A.2d 356 (quoting *Van Arsdall*, 475 U.S. at 682, 106 S.Ct. at 1437, 89 L.Ed.2d at 685). We consider an error to be harmless if we are " 'satisfied that there is no

---

7. For this reason, we can distinguish the instant case from *Ebb*, 341 Md. at 578, 671 A.2d 974. In *Ebb*, the appellant argued that defense counsel should have been allowed to question the witnesses who testified against him regarding the criminal charges they faced, which, we note, were unrelated to the case before the court. On voir dire, however, those witnesses "testified that the State had not offered and that they did not expect leniency in exchange for their testimony." *Id.* at 590, 671 A.2d 974. In the absence of any proffered evidence of *quid pro quo* that would tend to show bias or motive, the trial court prohibited that line of questioning, and the Court of Appeals affirmed. To rely upon *Ebb*, in our view, would miss the point upon which we hammered *supra*. When it ruled, the trial court in *Ebb* specifically considered whether the proffered testimony would present any admissible evidence of bias or motive. Finding none, it excluded the testimony. Here, the trial court specifically acknowledged that evidence of bias and motive did exist, but nonetheless excluded the testimony. Furthermore, unlike in *Ebb*, where the proffered testimony bore no relationship to the charges before the court, the proffered testimony here was directly relevant to the charges.

reasonable possibility that the evidence complained of—whether erroneously admitted or excluded—may have contributed to the rendition of the guilty verdict.'" *Smallwood,* 320 Md. at 308, 577 A.2d 356 (quoting *Dorsey v. State,* 276 Md. 638, 659, 350 A.2d 665 (1976)).

■ Here, we cannot be sure that the jury would have reached the same verdict had the defense been allowed to tell the entire story regarding the conflict between Christina and her father. Although the court below allowed questioning about family discord that skirted the edge of prohibited subject matter, the proffered cross-examination addressed subject matter at the heart of the accusations. In this case, moreover, the State presented no physical or collateral evidence that abuse had occurred. The case against appellant boiled down to the word of the accuser against that of the accused. Appellant has offered significant evidence that his accuser had motive to lie, and exclusion of that evidence could reasonably have contributed to the guilty verdict. We thus reverse that verdict and remand to the court below.

## II

Appellant also contends that the court erred by prohibiting the defense from introducing more of the comments he made to a social worker, Jody Holland, who was present at the time he was arrested. Holland testified as follows:

Q: Ms. Holland, did you have occasion to interview this Defendant, John Churchfield? . . .

A: He was interviewed on February the 7th.

Q: And where did that interview take place?

A: At the Department of Social Services.

Q: Who was present for the interview?

A: Mr. Churchfield, myself and Detective Barnes.

Q: At some point in time that same day was Mr. Churchfield arrested?

A: He was.

Q: Did that occur in your presence?

A: Yes.

Q: And was that also at DSS?

A: Yes.

Q: What, if anything, did you hear Mr. Churchfield say?

DEFENSE COUNSEL: Objection.

THE COURT: Overruled.

Q: What, if anything, did you hear Mr. Churchfield say as he was being arrested and placed in handcuffs?

A: I heard him say I'll take care of that bitch when this is over.

DEFENSE COUNSEL: Object and move to strike, Your Honor.

THE COURT: Denied.

On cross-examination, the defense sought unsuccessfully to elicit an expansion of appellant's conversation with Holland:

Q: At the interview when the Defendant made this statement, he denied any sort of sexual contact with Christina, did he not?

PROSECUTOR: Objection, Your Honor.

THE COURT: Sustained.

DEFENSE COUNSEL: May we approach, Your Honor?

THE COURT: Yes. (Whereupon, counsel and the Defendant approached the bench and the following occurred out of the hearing of the jury panel:)

DEFENSE COUNSEL: Judge, if part of the statement comes in, doesn't it all come in? I mean, it just seems to me that the State's only able to use the inculpatory portion of it, not the exculpatory portion, that seems very unfair to me.

PROSECUTOR: Well, it might seem unfair but that's the law, you know it's admissions against party opponents. The statement's only admissible if one party is introducing against the others; therefore, you can't introduce your own statement especially if they are self-serving.

THE COURT: I'll sustain the objection.

Citing several Maryland cases, appellant argues that because the State was allowed to introduce part of a confession or admission into evidence he should have, in turn, been allowed to introduce the remainder of that statement, in which he denied having sexual relations with Christina. *See, e.g., Hadder v. State,* 238 Md. 341, 354, 209 A.2d 70 (1965) ("if a confession be admissible, the accused may insist upon it being offered in its entirety, and not simply selected portions thereof"); *Bell v. State,* 234 Md. 254, 258, 198 A.2d 895 (1964) ("In the case of confessions it is the general rule that the whole of a confession must be admitted. Neither side can select the incriminatory or exculpatory portions."); *Williams v. State,* 205 Md. 470, 473, 109 A.2d 89 (1954) ("all of a statement, a part of which constitutes a confession or an admission, is admissible in evidence, the exculpatory as well as the inculpatory"); *Walters v. State,* 156 Md. 240, 243, 144 A. 252 (1929) (" 'The offer in testimony of a part of a statement or conversation upon a well-established rule of evidence, always gives to the opposite party the right to have the whole.' ") (quoting *Smith v. Wood,* 31 Md. 293, 296–97 (1869)). To the State's contention that appellant's full statement would be self-serving, appellant explains that the State cannot introduce a portion of his statement and thereafter prohibit the defense from introducing "the entire conversation in which an admission introduced in evidence against him was made, notwithstanding the fact that a part of the conversation is self-serving." *Braxton v. State,* 57 Md.App. 539, 546, 470 A.2d 1327 (1984) (citing *Williams,* 205 Md. at 473, 109 A.2d 89).

Aside from arguing that the court misapplied the party opponent hearsay exception [8] to unfairly prejudice him by allowing the jury to misread his anger and shock as an admission of guilt, appellant also avers that the remainder of his statement was admissible under the common law doctrine of verbal completeness. That doctrine "allows a party to respond to the admission, by an opponent, of part of a writing or conversation, by admitting the remainder of that writing or

---

**8.** *See* Md. Rule 5–803(a).

conversation." *Conyers v. State,* 345 Md. 525, 541, 693 A.2d 781 (1997) (citing *Richardson v. State,* 324 Md. 611, 598 A.2d 180 (1991)). In general, the right of the party responding to the admission is governed by three general conditions:

 i. The utterance to be admitted may not be irrelevant to the issue;

 ii. No more of the remainder of the utterance than concerns the same subject, and explains the part of the utterance already in evidence, may be admitted; and

 iii. The remainder is received as an aid in construction of the utterance as a whole and is not in itself considered to be testimony.

*Conyers,* 345 Md. at 541–42, 693 A.2d 781 (citing *Feigley v. Baltimore Transit Co.,* 211 Md. 1, 10, 124 A.2d 822 (1956)); *see also Newman v. State,* 65 Md.App. 85, 96, 499 A.2d 492 (1985) ("to be admissible, the remainder must not only relate to the subject matter, but must also tend 'to explain and shed light on the meaning of the part already received' or 'to correct a prejudicially misleading impression left by the introduction of misleading evidence.'") (citing *Bowers v. State,* 298 Md. 115, 468 A.2d 101 (1983), McCormick, *Evidence* § 56 (3d ed.1984); *White v. State,* 56 Md.App. 265, 273, 467 A.2d 771 (1983)). Of course, the remainder is also subject to the strictures of Md. Rule 5–403, and its prejudicial nature, if any, may not outweigh its explanatory value. *Id.*

Finally, appellant contends that the remainder of his conversation with Holland is admissible under Maryland Rule 5–106, which provides that "[w]hen part or all of a writing or recorded statement is introduced by a party, an adverse party may require the introduction at that time of any other part of any other writing or recorded statement which ought in fairness to be considered contemporaneously with it." Citing *Conyers,* appellant explains that Rule 5–106 allows the admission of evidence that might otherwise be considered hearsay, if it is offered as an explanation of other admitted evidence rather than as substantive proof. *See Conyers,* 345 Md. at 541, 693 A.2d 781 ("Maryland Rule 5–106 does not change the

requirements for admissibility under the common law doctrine or allow the admission of otherwise inadmissible evidence, 'except to the extent that it is necessary, in fairness, to explain what the opposing party has elicited.' In such a circumstance, the evidence is offered merely as an explanation of previously-admitted evidence and not as substantive proof.") (quoting Md. Rule 5–106, comm. note). Rule 5–106, appellant contends, would trump any objections that the State might present regarding the self-serving nature of his statement denying sexual relations with his daughter.

■ Appellant's arguments fail, however, for the same reasons the appellant's argument failed in *Conyers*—the two parts of the "same" statement to which appellant refers were actually two *separate* conversations. If *Conyers* and Rule 5–106 stand for the proposition that the verbal completeness doctrine is alive and well in Maryland, *Conyers* also makes clear that, except in rare circumstances,[9] the admissible remainder must be "the remaining part of a *single* writing or conversation" for the doctrine to apply. *Conyers,* 345 Md. at 542, 693 A.2d 781 (emphasis added). Here, appellant's vow to "take care of that bitch" was an outburst he made when he was arrested; it was not part of the substance of his investigative interview with Holland earlier, during which he denied his daughter's allegations of abuse. The trial court thus did not err when it determined that appellant's expression of shock and anger (for whatever reason it occurred) was not part of the statement he gave in Holland's presence.

■ We also believe that, even if the trial court had erred by excluding appellant's earlier denials, such error was cured by his own testimony about the statement in question:

---

9. As an example of such rare circumstances, the Court of Appeals cited the New Mexico case *State v. Baca,* 120 N.M. 383, 902 P.2d 65 (1995), in which the New Mexico Supreme Court allowed introduction of a second statement that corrected what might have been considered syntactical confusion in the first statement. *See Conyers,* 345 Md. at 542–43, 693 A.2d 781.

Q: There's been testimony that you when you were placed under arrest you said I'll fix that bitch when this is over with?

A: Yes, sir.

Q: Did you say that?

A: Yes, sir, I was very upset for being arrested for something I hadn't done.

Q: What did you mean by that?

A: It was just a phrase. I mean, she had done so many things in the past, it was just one more thing she had done, you know. I was more majorly upset about it because I had never been arrested before.

This testimony gave appellant adequate opportunity to place the remark in its larger context and, arguably, should be no less convincing to a jury than rote denials made in an investigatory interview. Thus, any possible error would have been harmless beyond a reasonable doubt. *See Smallwood,* 320 Md. at 308, 577 A.2d 356; *Dorsey,* 276 Md. at 659, 350 A.2d 665.

### III

Finally, appellant contends that the court below erred when it overruled his motion *in limine* to exclude the statement described in section II *supra* as irrelevant, prejudicial and potentially confusing to the jury. In so ruling, the court opined that "an arrestee's reaction to arrest can have probative value and ... while everything you say may be appropriate argument to a jury, it seems to me that the prejudicial affect [*sic* ] of the statement is not so great as to outweigh the possible probative value." On appeal, appellant attacks the court's reasoning under Maryland Rule 5–401. If relevant evidence, he argues, tends "to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence," the statement in question was irrelevant. In his estimation, it "was as consistent with outrage over being falsely accused as with consciousness [of] guilt," and thus

cannot enlighten the jury as to whether he had sexually abused his daughter. *See State v. Joynes*, 314 Md. 113, 119–20, 549 A.2d 380 (1988). Appellant also contends that, even had the statement borne some probative value, such was outweighed by its potential for unfair prejudice. *See* Md. Rule 5–403. The fact that appellant referred to his own daughter using an unflattering and offensive epithet, he argues, may have repelled members of the jury and blinded them to his legitimate defenses.

 It was, however, for the jury to determine how to interpret the true meaning of appellant's outburst upon arrest. Were we to adopt his relevance analysis, we would strip the jury of its role as arbiter of the weight and credibility of evidence. Moreover, given the broad discretion we afford the trial court in evidentiary rulings, and the degree of damage to appellant's case that we must find to reverse a conviction based on prejudice,[10] we cannot reverse under Rule 5–403. Even if we could find abuse of discretion, as we explained *supra*, appellant had ample opportunity during his testimony to offset any damaging statement and explain why he made it.

\* \* \*

We recognize that our holding today might concern strong advocates for the rights of victims of child abuse and other crimes of a sexual nature. To those persons, we emphasize that our opinion should not, in any way, be construed to support blaming the victims of sexual abuse or diminish this State's efforts to investigate and prosecute perpetrators of the same. Nor do we intend to weaken Maryland's Rape Shield Statute, which was not, we note, at issue here. Complaining witnesses sometimes have motives to lie, even to invent out of whole cloth the occurrence of crimes. When such motives go to the very heart of the accusations against defendants—as

---

**10.** "Prejudice, in the evidentiary sense, that can outweigh probative value involves more than mere damage to the opponent's case." *Cook v. State*, 84 Md.App. 122, 138, 578 A.2d 283 (1990) (quoting *State v. Allewalt*, 308 Md. 89, 102, 517 A.2d 741 (1986)).

they did here, where Christina accused her father of the very activity from which he sought to protect her—the value of testimony regarding a complainant's motives outweighs any prejudicial effects. This holds true even when the nature of the proffered testimony would greatly embarrass the witness. We reverse appellant's conviction and remand this matter to the court below for proceedings consistent with this opinion.

**JUDGMENT REVERSED.**

**COSTS TO BE PAID BY WICOMICO COUNTY.**