*Albert Otto v. State of Maryland*, No. 60, September Term 2017. Opinion by Hotten, J.

**CRIMINAL LAW – EVIDENCE – COMMON LAW DOCTRINE OF VERBAL COMPLETENESS –** The Court of Appeals held that the trial court did not abuse its discretion by refusing to admit non-redacted transcripts of jailhouse telephone calls, pursuant to the common law doctrine of verbal completeness. Although portions of the transcript were relevant, a reasonable person could conclude that the non-redacted call transcripts did not contain the same subject as the admitted portions, and would not aid the fact finder in construing the utterance as a whole. *Feigley v. Baltimore Transit Co.*, 211 Md. 1, 10, 124 A.2d 822, 827 (1956).

**CRIMINAL LAW – EVIDENCE – COMMON LAW DOCTRINE OF VERBAL COMPLETENESS – INDEPENDENT ADMISSIBILITY –** The Court of Appeals held that evidence admitted pursuant to the common law doctrine of verbal completeness need not be independently admissible.

IN THE COURT OF APPEALS

OF MARYLAND

No. 60

September Term, 2017

_____

ALBERT OTTO

v.

STATE OF MARYLAND

_____

Barbera, C.J.,
Greene,
Adkins,
McDonald,
Watts,
Hotten,
Getty,

JJ.

_____

Opinion by Hotten, J.
Watts, J., joins in judgment only.

_____

Filed: June 21, 2018

Albert Carl Otto ("Petitioner") was charged in two separate indictments with three counts of second-degree rape of S.L.[1], the mother of his three children. S.L. accused Petitioner of raping her on January 1, 2015, January 8, 2015, and February 2, 2015. In November 2015, Petitioner was tried in a consolidated jury trial in the Circuit Court for Montgomery County. The jury found Petitioner not guilty of the January 1, 2015 charge, guilty of the January 8, 2015 charge, and a mistrial was declared regarding the February 2, 2015 charge. Petitioner was sentenced to a term of seven years incarceration and five years of supervised probation. The court suspended all but the 280 days time served. Petitioner also must register as a Tier II sex offender.[2] *See* Md. Code (2008 Repl. Vol., 2017 Suppl.),

---

[1] To protect the privacy of the claimant and her daughter, the parties agreed to reference the claimant as S.L. and her daughter as D.L.

[2] A "Tier II sex offender" means a person who has been convicted of:
(1) conspiring to commit, attempting to commit, or committing a violation of § 3-307(a)(4) or (5), § 3-324, § 11-207, or § 11-209 of the Criminal Law Article;
(2) conspiring to commit, attempting to commit, or committing a violation of § 11-303, § 11-305, or § 11-306 of the Criminal Law Article, if the intended prostitute or victim is a minor;
(3) conspiring to commit, attempting to commit, or committing a violation of § 3-314 or § 3-603 of the Criminal Law Article, if the victim is a minor who is at least 14 years old;
(4) conspiring to commit, attempting to commit, or committing an offense that would require the person to register as a tier I sex offender after the person was already registered as a tier I sex offender;
(5) a crime that was committed in a federal, military, tribal, or other jurisdiction that, if committed in this State, would constitute one of the crimes listed in items (1) through (3) of this subsection; or
(6) a crime in a court of Canada, Great Britain, Australia, New Zealand, or any other foreign country where the United States Department of State has determined in its Country Reports on Human Rights Practices that an

(continued . . .)

§ 11-704 of the Criminal Procedure Article, ("Crim. Proc."). Thereafter, Petitioner noted a timely appeal to the Court of Special Appeals, which affirmed the trial court in an unreported decision. *Otto v. State*, No. 2758, SEPT.TERM, 2015, 2017 WL 2839150, at *9 (Md. Ct. Spec. App. July 3, 2017), *cert. granted*, 456 Md. 253, 173 A.3d 154 (2017). Petitioner now asks this Court to consider whether the trial court erred in allowing the State to admit redacted portions of telephone calls Petitioner made to his mother while in pre-trial detention, but denying Petitioner's request to admit the remaining telephone transcripts pursuant to the common law doctrine of verbal completeness.[3] For reasons to be explained, we shall affirm the judgment of the Court of Special Appeals.

## FACTUAL AND PROCEDURAL BACKGROUND

Petitioner and S.L. dated for several years and produced three children from the relationship. Petitioner and S.L. did not live together and were not married at the time of any of the alleged rapes. S.L. lived with the three children in a two-bedroom apartment in Montgomery County. S.L. did not speak English, and was not a United States citizen.

---

(. . . continued)

independent judiciary generally or vigorously enforced the right to a fair trial during the year in which the conviction occurred that, if the crime were committed in this State, would constitute one of the crimes listed in items (1) through (3) of this subsection. *See* Crim. Proc. §11-701(p)

As part of the registration requirements, a tier II sex offender must register every 6 months with a local law enforcement unit. The term of registration for a tier II sex offender is twenty-five years. Crim. Proc. § 11-707(a), 4(ii).

[3] At common law, upon one party offering of testimony in the form of a partial statement or document, the opposite party has the right to introduce the whole conversation or document. *See Smith v. Wood*, 31 Md. 293, 296–97 (1869).

Petitioner and S.L. discussed living together at Petitioner's home in Frederick County, Maryland; however, those plans were abandoned when S.L. learned that Petitioner was residing with another woman for the duration of S.L. and Petitioner's relationship.

Between January 8, 2015 and February 2, 2015, Montgomery County police officers responded to S.L.'s apartment multiple times, where S.L. reported forcible sexual intercourse between her and Petitioner. On February 2, 2015, D.L., the seven-year old daughter of Petitioner and S.L., placed a 911 call stating that "my dad is hurting my mom." Thereafter, police arrested Petitioner on February 3, 2015, and later charged him with three counts of second-degree rape.

On the first day of trial, the State called D.L. to the stand, anticipating that she would testify that she witnessed Petitioner hurt S.L. Prior to trial, D.L. was interviewed by Maggie Newton, a forensic interviewer employed by Montgomery County Child Welfare Services. During the videotaped interview, D.L. described how she watched through a crack in the door as Petitioner hurt S.L. D.L. told Newton that her father hurt her mother on more than one occasion. Notwithstanding the recorded interview, D.L. testified that she could not remember telling Newton that Petitioner hurt S.L. To refresh her recollection, the State played recorded portions of D.L.'s 911 call, but D.L. indicated that she still did not remember speaking to Newton.

The State showed D.L. a still image from the videotape of D.L.'s interview with Newton, which depicted D.L. sitting in an interview room with Newton. After seeing the videotape image, D.L. testified that she recalled sitting with a woman, but did not remember the conversation. Outside of the presence of the jury, the State played an hour

3

of the videotape to refresh D.L.'s recollection. The jury re-entered the courtroom and the State asked D.L. if she now remembered telling someone that Petitioner hurt S.L., to which D.L. replied, "[n]o. My dad did not hurt my mommy." Thereafter, the State moved to have the entire video admitted into evidence as a prior inconsistent statement pursuant to Maryland Rule 5-802.1(a). Petitioner initially objected to the videotape's admission in its entirety. However, after hearing the testimony he withdrew his objection to the videotape's admissibility, maintaining objection to certain portions of the video recording being redacted as improper evidence of other crimes, wrongs, or acts. *See* Md. Rule 404(b). Ultimately, the videotape was admitted into evidence and played for the jury.

On the second day of trial, Petitioner requested that S.L. assert her spousal privilege in front of the jury. Petitioner was released pre-trial with the condition that he have no contact with S.L. Petitioner, however, violated the no contact order and married S.L. prior to trial. At trial, S.L. took the stand and proclaimed, "because of the fact that I am married to my husband, I can use that [marital] privilege and not to testify." Without S.L., the State offered various police officers as witnesses, who testified regarding the statements made by S.L. as a complaining witness, including S.L.'s original 911 call reporting a rape on January 8, 2015.

On the fourth day of trial, the State sought to admit excerpted portions of telephone calls that Petitioner made to his mother while he was in pre-trial detention. Consistent with

4

common practice, these calls were recorded.[4]  Prior to trial, the State compiled a series of audio excerpts from the recorded calls and prepared a redacted paper transcript.  Over Petitioner's objection, the trial court admitted the redacted paper transcript of the calls ("the redacted call transcript") into evidence as State's Exhibit 96 and the excerpted audio recording of the calls was played for the jury.  During Petitioner's case-in-chief, he sought to admit the non-redacted paper transcript of State's Exhibit 6 ("the non-redacted call transcript") pursuant to the doctrine of verbal completeness.  For analytical purposes, the non-redacted call transcript is included below in italic and the redacted call transcript was admitted as follows:

[PETITIONER]: All right. Well, today is Sunday. You have time for that. They won't do anything today. Definitely, look, you need to get in touch with [D.L.] and [S.L.] and take them out grocery shopping. Take some money over. You need to get an idea of where her head is at and if she intends to try to help with all of this, okay?

[MOTHER]: How is she going to tell me that? If I try to do that - -

[PETITIONER]: Mom, you'll get an idea. Just spend the time with her, okay, and get them out grocery shopping, take some money over.

[PETITIONER]: Mom, I am worried, I am worried about myself and my best chance is for her help out.

[MOTHER]: I know that, honey. I know that…. Are you still there?

[PETITIONER]: Yeah.

[MOTHER]: Okay. Well, talk while you can.

---

[4] Telephone calls made by inmates in detention may be recorded.  Montgomery County Maryland, Department of Correction and Rehabilitation – Inmate Phone Calls, http://www.montgomerycountymd.gov/cor/inmates/Telephone.html (https://perma.cc/TRD7-QHX4) (last visited May 3, 2018).

[PETITIONER]: All right. Let me just - - please do that…. I'm worried about the kids having food and I'm worried about where her state-of-mind is…and where it's going to stay.

[MOTHER]: Oh, I don't think, I didn't get a chance to ask. I was (unintelligible). I think they're going to keep Harry.

[PETITIONER]: They are. I, I talked to them. But please do that, take some money out of my wallet and, you know, three or [four hundred,] take them grocery shopping, give her the rest of the money, okay, and, and try to spend some time with them and get some idea where her head is at and what she intends to do to help me with this.

****

[PETITIONER]: No, I have not been able to - -

[MOTHER]: Huh?

[PETITIONER]: - - get hold of my attorney.  Tom won't answer the phone. I talked to Maria. Again, mom, if it works out, see how often the kids come there to the house and, you know, so be it. I need to keep an eye on them.

[PETITIONER]: I'm trying to find out through Maria and Harry, her attorney, if she's going to be willing to marry me still and - -

[MOTHER]: Well, we'll you haven't talked to Lauren or your dad, right?

[PETITIONER]: I just talked to [L]. My dad is busy on a conference call, supposedly.  So - -

[MOTHER]: So did she, did you tell her I said that they were going to discuss with Harry today about you marrying her?

[PETITIONER]: I didn't, we didn't get into that. I just told her how important it is to me that my family open up and accept them right now. They're my kids and, and to do what we can for them - and I want them - -

[MOTHER]: Did you tell [L] you loved her?

[PETITIONER]: No, it's just - -

6

[MOTHER]: You need, you need to.

[PETITIONER]: If you can talk to Maria today and find out if this is going to happen or not, okay?

[MOTHER]: Maria and Harry? If she's willing to marry you?
[PETITIONER]: Yeah.

****

[PETITIONER]: Stay close to her and the kids.

[MOTHER]: Huh?
[PETITIONER]: Stay close with her and the kids.

[MOTHER]: I know that. Why do you think I was trying to get her up to Frederick?

[PETITIONER]:  I know.

[MOTHER]: You know, I'd like to see my grandchildren, too.

[PETITIONER]: Yeah, keep working on it

[MOTHER]: Yeah.  And the [A] thing, issue has gotten so much better.

[PETITIONER]: Yes, she has.

[MOTHER]: Much, much better. I was surprised when I called yesterday. She was in the parking lot and said I'm here.  Shall I come in and [go potty]? I said she's so - -

[PETITIONER]: You can, you can - -

[MOTHER]: (Unintelligible.)

[PETITIONER]: - - probe, probe, probe [D.L.] for information when you're with them too - and - -

[MOTHER]: Do what?

[PETITIONER]: I said probe [D.L.] for information when you're with them too.

****

*Automated Speaker: Call number 59969874, inmate ID 1502305, date 2015, 3/7. Time 083006. Dialed number [redacted] from station 8113. The time is 8:30 a.m. No three-way calls are allowed. Any attempts to affect these types of calls may result in disciplinary action. Press 1 to place a - - please enter your PIN number, followed - - after the tone please say your first and last name.*

*[PETITIONER]: Albert Otto.*

*Automated Speaker: Please listen carefully as our menu options have changed. For calls within the United States - - your account balance is $41.50. The cost of this call will be an operator service charge of 85 cents, excluding taxes and other applicable fees. The time limit is 15 minutes. Hello. You have a call at no expense to you from - -*

*[PETITIONER]: Albert Otto*

*Automated Speaker: - - an inmate at Montgomery County Detention Center. To accept this call, press or say 5. To refuse this call, hang up now. This call will be recorded and subject to monitoring at any time. Thank you for using IC Solutions. You may begin speaking now.*

*[PETITIONER]: Hello?*

*Unidentified Speaker: Hi, A1.*[5]

*[PETITIONER]: Hey.*

*Unidentified Speaker: How are you holding up?*

*[PETITIONER]: Not good.*

---

[5] The "Unidentified Speaker" is Petitioner's long-time co-worker named Janice Neudorfer.

8

*Unidentified Speaker: I have been running over all these scenarios in my head of what I should have done yesterday, but I'm so sorry. We heard this was the worst judge possible and I guess it played out to be true.*

*[PETITIONER]: Yeah, he was pretty nasty.*
*Unidentified Speaker: I, I'm sorry I didn't get your call last night either. Are you there?*

*[PETITIONER]: Yeah. Yeah. Sorry. Yes, I am. Anyway, I'm very sorry you guys have put out so much and they stuck me right back in here.*

*Unidentified Speaker: You know, I don't think, I don't think the judge really heard that it was sort of a double jeopardy, that there was an error. I don't, I think it all got confused.*

*[PETITIONER]: Yeah, my attorney did a terrible job.*

*Unidentified Speaker: Yeah, I wanted to say that too, but I mean it could still turn around on the 20th because what that was about was the CVS incident. So it, it doesn't seem fair to punish you twice for the same incident, the same, you know - -*

*[PETITIONER]: No, because that was already litigated at the bond hearing the other day and my attorney didn't even point that out, you know?*

*Unidentified Speaker: He mentioned it once because he did mention the high bail set because of it, but then the conversation just went in all these other directions and that didn't remain the focus.*

*[PETITIONER]: No, no, he really lost it and I don't, I don't know what to do. And, you know, I'm sorry I'm - -*

*Unidentified Speaker: What? You did what?*

*[PETITIONER]: Huh?*

*Unidentified Speaker: I didn't hear what you said.*

*[PETITIONER]: I said he really, you know, lost it. He let the whole thing lose direction and he didn't, didn't keep it on focus and - -*

9

*Unidentified Speaker: He didn't.*

*[PETITIONER]: - - you know, instead of pointing out, you know, again and again how she wasn't supposed to be the one there, I didn't violate this intentionally, it was supposed to be her sister, you know, and, and the State's Attorney said that the detective said that they caught us together inside the CVS. That's not even true. As soon as they showed up, I was arrested right at my car and, by one of the detectives. By the time that female detective showed up, I was already in handcuffs by those other detectives. And, and - -*

*Unidentified Speaker: Yeah. Yeah.*

*[PETITIONER]: - - that one was gone.*

*Unidentified Speaker: Well, you see that - -*

*[PETITIONER]: That woman never even saw us together. So that's, you know, and the CVS security footage would show we were never in that store together and that's perjury on the State's part.*

*Unidentified Speaker: It sure seems like false, false statements in court. It's, it's unbelievable how bad the, your luck is on this. I just can't believe it.*

*[PETITIONER]: I know. I was talking to my attorney about me getting the CVS security footage or something because I mean that would prove the State lied on that and we weren't there together.*

*Unidentified Speaker: Right.*

*[PETITIONER]: You know?*

*Unidentified Speaker: I think, I think there's, you know, a lot of the things that we can do on the 20th and we'll all certainly be there to testify and hopefully this will get straightened back out.*

*[PETITIONER]: Yeah, I - -*

*Unidentified Speaker: But - -*

*[PETITIONER]: - - I don't want to - -*

*Unidentified Speaker: Say it again.*

*[PETITIONER]: No, if I'm going to get out on the 20th, you know, I don't want to lose my home and stuff in the meantime. But if I don't get out on the 20th, then there's not going to be any point in maintaining things. But, in the meantime, I don't want to lose all my stuff. And if there is - -*

*Unidentified Speaker: Well, I was counseling your dad to, you know, hold everything until the 20th and I think he's, I think he's listened to that. I think he wants a plan on the 20th, but I think, I think he's going to hold together until then.*

*[PETITIONER]: Yeah, he's, he's not wanting to help me very much. I don't know, I just don't know who else to turn to. But - -*

*Unidentified Speaker: What do you think is going to happen bill-wise between now and the 20th?*

*[PETITIONER]: The rent is due on the 15th. That's 1,700. That's the only major thing. My electric bill at some point. I don't, I don't know. My cell phones, I guess, are due. And like I said, that, unfortunately, is a big bill this month just because there haven't been, you know, the last weekend in January before all this, you know, stuff even happened, I had gotten a new, a new cell phone and then I've had to get two new cell phones because of the, the police.*

*Unidentified Speaker: Right. Well, I think it takes 30 days to evict, you know? So the, the rent, you know, they can't just on the 15th decide to evict. There is a process.*

*[PETITIONER]: No, but, you know, my landlord, you know, I've been there eight years. He's a very good guy to work with, but I hate to - -*

*Unidentified Speaker: Can you call him and talk to him or no?*

[PETITIONER]: Not yet. I'd like the rent to be covered one more month, at least, at least if I'm going to get out on the 20th. If I'm not going to get out on the 20th, then I can start making plans to pack all my stuff up. But, you

11

know, I told Maria in the meantime and my, she's helping my mom, my daughter's mom. I'm wanting to move her and the kid into my house if something - - my best chance out of this is for my family to help her out because she, you know, if she helps recant all this stuff if, if, you know, she's left in an entirely abandoned position right now too, then she's just going to want to cooperate with the State to get the State's assistance and that's going to screw me. So - -

*Unidentified Speaker: It sure is a, it's a, it's a cluster [explicative].*

*[PETITIONER]: It is. But - -*

*Unidentified Speaker: The whole thing.*

*[PETITIONER]: - - but my best chance is for her and the kid to move into my house at least for - -*

*Unidentified Speaker: But that can't happen because you're not allowed to have contact with her.*

*[PETITIONER]: Well, but I don't even know if I'm getting out on the 20th yet or not.*

*Unidentified Speaker: I, I think that the, there was an error made, like you said, and it, it just hasn't gotten, the court hasn't had any chance to hear your side of anything until your attorney got five minutes yesterday it seems and he didn't do a very good job.*

*[PETITIONER]: He didn't do a very good job.*

*Unidentified Speaker: So the, you know, we, on the 20th you'll have a chance to at least begin to tell the court system what, you know, what, who you are and what you're about and that this is not you. I mean I, all night long I've been laying there thinking, oh my God, if I just stood up and took a chance and said this, that maybe he would have heard me or let me speak, but he wouldn't - -*

*[PETITIONER]: No.*

*Unidentified Speaker: - - he wouldn't, he was very much in control.*

12

*[PETITIONER]: Yeah. Yeah, the judge was very, very nasty.*

*Unidentified Speaker: And that he's a very hard judge. I mean we knew that as soon as we knew his name, Tom knew that I should say. And I think Tom as [sic] on the fence about whether to try something yesterday or get an extension, I don't know what that would have done, but you know we were convincing him that it's very, very simple and very clear and he tried and he made an effort, but - -*

*[PETITIONER]: Yeah, but he did a terrible job.*

*Unidentified Speaker: And, yeah, I kind of agree with you.*

*[PETITIONER]: He didn't know the case.*

*Unidentified Speaker: Right. No.*

*[PETITIONER]: I don't know what to do about - -*

*Unidentified Speaker: No, we, we helped him 30 minutes before, an hour before that and that's about all he had to go on.*

*[PETITIONER]: I tried calling him several times before and he just, he never answered his doggone phone.*

*Unidentified Speaker: Uh.*

*[PETITIONER]: But, anyway, I - -*

*Unidentified Speaker: I, I'm just sick about this. I think on the 20th, I think if we can all hold out until the 20th, maybe we can get this, at least this piece of it straightened out and I, I'm just praying they keep you at the detention center, but I don't know if they will or not.*

*[PETITIONER]: They're not. I'm - -*

*Unidentified Speaker: No one knows.*

*[PETITIONER]: No, I'm being, I'm being moved up to Clarksburg. They already said that. They're going to move me to the jail.*

13

*Unidentified Speaker: Will we, will we have different access to you up there, do you know?*

*[PETITIONER]: Less, I believe. I don't know. I really don't know. I think I'll get a lot less phone time then. So it's going to be really hard for me.*

*Unidentified Speaker: For you?*

*[PETITIONER]: Yeah, it will be harder for me to call people and find out what's going on, but I don't know. If you guys are, you know, I hate to keep leaning on you, but if you guys at least keep some of my stuff afloat for the next month, then if I find out what's, whether I get out or not.*
*Unidentified Speaker: How will we find out about the electricity? Will your mom be able to find the bill there in the mail pile?*

*[PETITIONER]: Yeah, I guess so. When my attorney comes to see me, I'm going to have to write down. I guess passwords, how to get out, you know, I keep all my stuff on my AOL account, you know, under favorites and payable stuff. So I have to write down my passwords.*

*Unidentified Speaker: Right. Right. Right.*

[PETITIONER]: Right and on - -

*Unidentified Speaker: Gosh, if only we're allowed to start writing things in there. I don't understand how that cannot be something you can do. Oh, I'm so sorry, you know? This is so unfair. I, I just can't imagine - -  and we're all struggling with how do we help her when she needs to feel the consequences of what, what she's done.*

*[PETITIONER]: No, but at the same time if we don't, you know, I hate to say it, but if we don't, my friends and family don't help her out, she's going to, you know, turn back to the state which isn't going to be good for me. So I talked to Maria yesterday about-talking to her, about getting her into my house. One way or another, you know - -*

*Unidentified Speaker: I don't know why getting into your house is the answer. I mean she needs food and, and medicine. Where is she living?*
*[PETITIONER]: In a, she's renting a room in Gaithersburg. I was just thinking, you know, I don't - -*

14

*Unidentified Speaker: And you've been paying for this for how many years?*

*[PETITIONER]: Since - -*

*Unidentified Speaker: Like what is, what is the support she's been used to?*

*[PETITIONER]: I've probably given her 1,500 a month for the last, I guess since my daughter was born.*

*Unidentified Speaker: I don't know how you manage it. Well, I think moving her into house is a big mistake, Al. I mean where are you going to live when you move out? Where, how - -*

*[PETITIONER]: I don't know. You know, her and, her - -*

*Unidentified Speaker: Does she - -*

*[PETITIONER]: - - working on an affidavit so that we could be around to have contact and maybe that will be in place. I just - -*

*Unidentified Speaker: I'm not sure they're working on that. I tried to bring that up at lunch and I'm not sure - - I'm not, I'm not sure how that's working. I don't know. Maybe the answer is to, to drop Tom and have Maria be your primary if that's possible.*

*[PETITIONER]: Yeah, I don't know. And, see, Maria insisted on how much better Tom is and Tom didn't do a great job. I don't know. I feel like he's just, he's not into the case. You know, I asked him specifically before hiring him if he had time for this case and he's assured me it would be a priority for him, but all he keeps talking about is money. We have a specific payment agreement, but he made it sound like at the hearing yesterday like he wasn't going to want to continue to represent me.*

*Unidentified Speaker: Yeah. Yeah, that was very unfortunate and I, sadly, he, he's anticipating that you're not getting out and if that's the case, then how on earth, you know, can he get paid? But that's all, that's all, you know, down the road. That's after the 20th. We need to stay focused on the 20th and I wanted to tell you that I emailed Star, so don't worry about that, and there's something else.*

15

*[PETITIONER]: Yes.*

*Unidentified Speaker: And - -*

*[PETITIONER]: They mailed me the bills, they're sitting there at my house. Sorry, Jan.*

*Unidentified Speaker: Al?*

*[PETITIONER]: Yeah, can you hear me? Hello?*

*Unidentified Speaker: Hello, are you there?*

*[PETITIONER]: Yeah, I said sorry, Jan, about all the, you know, hopefully I'll get out of here and get to build your garage.*

*Automated Speaker: One minute remaining.*

*[PETITIONER]: We're going to get cut off here in a minute. Can you hear me, Jan?*

*Unidentified Speaker: Yeah, I'll have to figure out how to, yeah, I'll have to figure out how to get some more money on this thing, but the delay is really hard to talk to you about and, Al, is your vision okay? Your dad was worried about you getting another hematoma. I mean are you - - are you okay health-wise?*

*[PETITIONER]: That would be [a] relief right now. I just - -*

*Unidentified Speaker: Well, I'm sure - -*

*[PETITIONER]: Yeah, I'm sorry to lean on you guys so much right now, but please try to help coordinate all this and I just don't know what else to do.*

*Unidentified Speaker: I'm trying, I'm trying, Al. Hang in there. Let's, let's, let's aim for the 20th and we'll do everything we can for then. But I don't think you can possibly move her in your house. I think that's a bad, bad idea. [PETITIONER]: Okay.*

*Unidentified Speaker: And so does everyone else. Hang in there, okay?*

16

*(End of recording.)*

****

[MOTHER]: She doesn't, she doesn't think any contact would be a very good idea.

[PETITIONER]: Let me just wait.

[MOTHER]: Okay.

[PETITIONER]: Yeah, my – (unintelligible), tomorrow, you were telling me to tell Harry [] that's going to be her attorney that I've been incarcerated and he needs to let her know, okay?

[MOTHER]: Yeah, I'm going to talk to your dad tomorrow. We should hire him? Because your dad backed off from it.

[PETITIONER]: No, he told me he would.

[MOTHER]: Yeah and I think he talked to him and I get into it over the phone line.

[PETITIONER]: Okay. He better not - -

[MOTHER]: I'm - -

[PETITIONER]: - - he better, he can't back off.

[MOTHER]: I'm going to, I'm going to push him to hire her, to hire him.

[PETITIONER]: Well, if he doesn't, that's going to be horrific.

[MOTHER]: Yes, I know, I know. I, I got that information from Maria tonight. I got a lot of information from Maria tonight.

[PETITIONER]: Okay.

[MOTHER]: I understand it. I understand, okay? That's why I'm going to push your dad tomorrow to hire that attorney.

17

[PETITIONER]: Yeah, if he doesn't, this is going to be real bad, mom.

[MOTHER]: Yes, I know.

[PETITIONER]: Okay.

****

[PETITIONER]: The best chance I have is for [S.L.] to recant all this. The only way she's going to be in the mood to do that is if my family takes care of her right now…..

[MOTHER]: Yeah, that's why your dad is paying for her attorney. Not, no, that's not why. He's doing that…

[MOTHER]: She already, she already approached your dad, your dad told me, and, and asked him to support her financially and he was upset about that and he told her no.

[PETITIONER]: Who approached her?

[MOTHER]: She approached your dad.

[PETITIONER]: Who did?

[MOTHER]: [S.L.].

[PETITIONER]: She did?

[MOTHER]: Yeah, your dad told me that.

[PETITIONER]: And he told her, no? Is he out of his [explicative] mind? What [explicative] is wrong with him?

[MOTHER]: I guess because he's paying for the attorney and I guess because they're not paying her money.

[PETITIONER]: Does he, does he, does he not understand what's going to happen to me if he doesn't help out? You better get that, that - -

[MOTHER]: You're breaking up. You broke up a little bit, honey.

18

[PETITIONER]: That, mom, listen to me. If he doesn't help her out, I am screwed. Get that message through to him, okay?

[MOTHER]: And, and which part - - he won't do that.

[PETITIONER]: It's obvious, it's obvious. Let me, I need to make a couple more phone calls while I can really fast.

[MOTHER]: Okay, honey. Honey, don't get upset. It's not going to do you any good.

[PETITIONER]: No, no, this needs to happen or I am screwed. If my family doesn't take care of her right now, I am screwed.

[MOTHER]: Well, your family means your dad, because your mother doesn't have the money.

[PETITIONER]: But you can, if she'll move into the house, you can stay there in the house with them, help her, get on her - - do you understand what I'm saying?

[MOTHER]: Yes. How long do you think I can stay here, honey?

[PETITIONER]: As long as it needs to be. As long as that rent is paid.

[MOTHER]: Do you want me to lose my home?

[PETITIONER]: No, I don't. You can bounce back and forth. You've been there for months before. You can do it again. You can bounce back - -

[MOTHER]: And I, and I didn't like doing that, but I'll do what I - -.

[PETITIONER]: Well, I'm sorry, but - -

[MOTHER]: - - can.

[PETITIONER]: - - that's what needs to happen right now. Let me make a couple phone calls real quick. I'll call you.

[MOTHER]: Okay. Okay, honey.

[PETITIONER]: Listen.

[MOTHER]: - - because it's not your phone.

[PETITIONER]: Listen. Listen. Yeah, I'm, I only have like another five minutes to be on the phone, so I need you to talk to them all tonight. And my dad needs to understand him shooting [S.L.] down, that was a huge mistake. The only chance I have is for my family to take them in, take care of those kids. If she wants to be part of this family, recant everything she said.

[MOTHER]: Your, I can't even tell you anything that was said.

[PETITIONER]: No, you can't, but listen to me. That is what needs to happen. My family needs to take care of her and those kids, those are my kids, let them - -

[MOTHER]: I know they're your kids, honey.

[PETITIONER]: And do this, make it (unintelligible) to my dad one way or another if this doesn't happen I am screwed.

[MOTHER]: And what happens if you don't get out on the 20th?

[PETITIONER]: Well, then I don't, I don't know. You know. You know, it, if our family opens their arms for her and helps out with these kids, I'm sure she'll be more than happy to help recant all this stuff. But if we screw her over, then she's not.

[MOTHER]: Well - -

[PETITIONER]: I mean she's already tried.

[MOTHER]: I understand what you're saying now, but I can't say back to you anything else.

[PETITIONER]: I know.

[MOTHER]: I understand what you're saying, but I can't say anything to you to make you - - go ahead.

20

> [PETITIONER]: That's what needs to happen and get through to my dad that he needs to help take care of her right now one way or the other.

After playing the audio excerpt for the jury, the State rested.

> Petitioner argued that when he said he was "going to be screwed[,]" he was referring solely to an upcoming bond hearing, not the impending trial, and that the non-redacted call transcript would illuminate that issue for the jury. Although the entire jail-house telephone call transcript spanned roughly 150 pages, Petitioner averred that the non-redacted call transcript would illuminate that issue for the jury. The trial judge disagreed, and opined that Petitioner's focus was not on S.L. recanting for the bond hearing, but was rather concerned that if his family did not provide basic amenities and support for S.L., she would be more compelled to testify against him. The trial judge commented that Petitioner's goal was to marry S.L. so that she could assert her marital privilege, rendering her unavailable to testify. The court denied Petitioner's request to admit the non-redacted call transcript, and thereafter the defense rested. Following Petitioner's conviction, he noted an appeal to the Court of Special Appeals.

> Before the Court of Special Appeals, Petitioner raised three issues:

> (1) whether the trial court erred in admitting the videotape recording of D.L.'s interview; (2) whether the trial court erred by not admitting the full transcript of the recorded jail telephone calls; and (3) whether the trial court erred by giving a jury instruction that [Petitioner] claims told jurors they could not ask questions.

*Otto*, 2017 WL 2839150, at *4. On the first issue, the Court of Special Appeals reasoned that Petitioner failed to preserve his claim on appeal because he withdrew his objection to the recorded interview at trial. *Id.* at *5. However, despite waiving his hearsay arguments,

21

"the recorded interview was admissible as a prior inconsistent statement because it meets the requirements of [Maryland] Rule 5-802.1(b)." *Id.* at *6. Regarding the second issue, Petitioner asserted that after admitting the redacted call transcript, he should have been permitted to introduce the non-redacted call transcript into evidence pursuant to the doctrine of verbal completeness. *Id.* The Court determined that it was not an abuse of discretion to admit only a portion of the transcript where the trial judge construed the content of the redacted call transcript narrowly. *Id.* at *8. With regard to Petitioner's third issue, the Court determined that Petitioner failed to make a timely objection to the jury instructions, thus waiving his claim for appellate review. However, apart from the waiver, the Court did not find an abuse of discretion with respect to the "jury instruction because it was a correct statement of the applicable law and was not covered by the other instructions." *Id.* at *9. Accordingly, in an unreported opinion, the Court of Special Appeals affirmed the judgment of the trial court. *Id.* Petitioner then noted the instant appeal.

Once again, Petitioner argues that it was reversible error for the trial judge to deny admission of the non-redacted call transcript. We granted *certiorari* to consider whether the trial court's exclusion of the entire jail call transcript violated the common law doctrine of verbal completeness.[6] Finding no such error, we affirm the judgment of the Court of Special Appeals.

---

[6] The question presented in the Petition for Writ of Certiorari appeared as follows:
(continued . . .)

22

**STANDARDS OF REVIEW**

Interpretation of the Maryland Rules presents a question of law, reviewed *de novo* to ascertain whether the trial court was legally correct in its rulings. *State v. Graves*, 447 Md. 230, 240, 135 A.3d 376, 382 (2016). However, when a trial court implements its interpretation of the Maryland Rules to determine whether evidence is admissible, it is exercising discretion conferred by those rules. Determining whether separate statements are admissible under the doctrine of verbal completeness is such a discretionary act, to be reviewed for an abuse of discretion. *Conyers v. State*, 345 Md. 525, 543, 693 A.2d 781, 789 (1997). *See id*. (holding "that the trial judge did not abuse his discretion by refusing to admit the separate hearsay statement under the doctrine of verbal completeness.").

---

(. . . continued)

> On the common law Rule of Completeness, (examined last by this Court in *Conyers v. State*, 345 Md. 525 (1997) and per *Churchfield v. State*, 137 Md. App. 668 (2001), a Question of First Impression on its application to *the same conversation*, and open question if the "[. . .]completeness doctrine is alive and well in Maryland") did the lower courts err after the State submitted a paragraph-long snippet of a 13-transcript page long conversation as evidence of Petitioner's consciousness of guilt in the charged rape of his now-wife when; (1) the trial court acknowledged there were "muddled" "thoughts" that was involved in the jail house statement, yet refused to provide the jury any other context or part of the conversation due to the State's objection, (2) the correct legal presumption "universally conceded" under the common law, is that the rest of the conversation was out of fairness to be provided to the jury as requested by Petitioner, not the other way around, and (3) the Court of Special Appeals acknowledges they may have disagreed with the narrow "subject" definition construed by the trial court, yet did not find any error by the trial court's refusal to let they jury themselves be provided the fuller statement and context.

An abuse of discretion exists where "no reasonable person would take the view adopted by the [trial] court, or when the court acts without reference to any guiding rules or principles." *Alexis v. State*, 437 Md. 457, 478, 87 A.3d 1243, 1254 (2014). "The decision under consideration has to be well removed from any center mark imagined by the reviewing court and beyond the fringe of what that court deems minimally acceptable. *Evans v. State*, 396 Md. 256, 277, 914 A.2d 25, 37 (2006). We, therefore, review the trial court's rulings for an abuse of discretion.

## DISCUSSION

The issue before us involves the application and interpretation of the doctrine of verbal completeness. In Maryland, the doctrine finds its roots from two sources: the common law and Maryland Rule 5-106. The application of the common law doctrine of verbal completeness requires that "[t]he offer in testimony of a part of a statement or conversation, upon a well-established rule of evidence, always gives to the opposite party the right to have the whole." *Smith v. Wood*, 31 Md. 293, 296–97 (1869). At common law, a party seeking to admit evidence pursuant to the common law doctrine of verbal completeness, could admit the remaining conversation or writing during the party's case-in-chief.

Maryland Rule 5-106 partially codifies the common law doctrine of verbal completeness, but allows writings or recorded statements to be admitted earlier in the proceeding than the common law doctrine. Maryland Rule 5-106 states, "[w]hen part or all of a writing or recorded statement is introduced by a party, an adverse party may require

24

the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it." The rule does not allow evidence that is otherwise inadmissible to be admitted, and it does not change the requirements for admissibility under the common law doctrine. However, where the evidence sought to be admitted is not otherwise admissible, the evidence may be admitted, in fairness, "as an explanation of previously-admitted evidence and not as substantive proof." *Conyers*, 345 Md. at 541, 693 A.2d at 788 (citing Md. Rule 5-106, Committee Note.). Nonetheless, the codification in Rule 5-106 is largely "one of timing, rather than admissibility." Md. Rule 5-106, Committee Note. Because Petitioner waited until presenting his case to submit the remainder of the telephone transcript, rather than contemporaneously as prescribed by Maryland Rule 5-106, the common law doctrine of verbal completeness is the proper lens through which to analyze Petitioner's claim.

Petitioner asserts that once the State admitted the redacted call transcript into evidence, he should have been permitted to introduce the non-redacted call transcript pursuant to the doctrine of verbal completeness. By barring the non-redacted telephone calls into evidence, Petitioner alleges that the jury was presented with a misleading interpretation of his statements in the redacted telephone calls. Thus, Petitioner argues that the doctrine of verbal completeness required the trial judge to admit the remaining telephone transcripts to put the redacted telephone calls in context. Respondent counters that the non-redacted call transcript was properly excluded because those remaining calls did not aid in constructing or interpreting the admitted evidence. Controversy exists

25

concerning the scope of the conversations that may be admitted pursuant to the doctrine of verbal completeness in Maryland. Thus, a resolution of the scope and limitations of the common law doctrine of verbal completeness must be addressed initially.

*The Common Law Doctrine of Verbal Completeness*

The common doctrine of verbal completeness was first outlined by this Court in *Feigley v. Baltimore Transit Co.*, 211 Md. 1, 124 A.2d 822 (1956).[7] The plaintiff-appellant in *Feigley* brought an action for damages against the Baltimore Transit Company ("defendant") after she was injured as a result of a sudden stop on a street car. *Id.* at 3, 124 A.2d at 823. Following the accident, a Baltimore Transit Company representative ("the company representative") interviewed Feigley and her daughter ("daughter"), who was also on the street car during the accident. *Feigley*, 211 Md. at 3-4, 124 A.2d at 823. The company representative obtained daughter's signed statement about the accident. *Id.* at 4, 124 A.2d at 823. At trial, when daughter was asked about the interview, she stated that the company representative assured her and Feigley that the Baltimore Transportation Company "would be responsible for everything" and that the accident occurred because a car crossed in front of the street car, causing the conductor to use an emergency setting. *Id.* The defendant objected to daughter's testimony. *Id.* On cross-examination, the daughter was given her signed statement, which she read to herself on the stand. *Id.* She

---

[7] *B & K Rentals & Sales Co. v. Universal Leaf Tobacco Co.*, 324 Md. 147, 596 A.2d 640 (1991), disapproved of *Feigley v. Baltimore Transit Co.*, 211 Md. 1, 124 A.2d 822 (1956) on other grounds. The holding in *B & K Rentals* does not disturb *Feigley*'s holdings on the doctrine of verbal completeness.

identified two primary inaccuracies in the statement, including "[1] that the motorman had put her mother in a seat after her fall, and [2] that her mother had not reached the center exit before the fall." *Id.* at 4, 124 A.2d at 824. The second inaccuracy was the claimed underlying reason for the fall, and thus was critical to the case. *Id.* During re-direct examination, Feigley's counsel sought to explore the entire conversation between daughter and the company representative, which the trial court refused. On appeal to this Court, Feigley argued that the entire conversation should have been admitted pursuant to the doctrine of verbal completeness.

Relying on Wigmore on Evidence, 3rd Ed., Vol. VII, § 2115 the Court explained "….when any part of an oral statement has been put in evidence by one party, the opponent may afterwards (on cross examination or re-examination) put in the remainder of what was said on the same subject at the same time." *Id.* at 9, 124 A.2d at 827. (Emphasis omitted). The *Feigley* Court recognized that a blanket rule allowing the remainder of a conversation could spur additional evidentiary issues, and implemented limits "as to the scope, and limits of the right." *Id.* at 10, 124 A.2d at 827. The Court limited the doctrine of verbal completeness' application, while still maintaining the general principle. We recognized three corollaries to the rule:

> [1] No utterance irrelevant to the issue is receivable;
> [2] No more of the remainder of the utterance than concerns the same subject, and is explanatory of the first part, is receivable;
> [3] The remainder thus received merely aids in the construction of the utterance as a whole, and is not in itself testimony.

27

*Id.* (Emphasis omitted). Applying these limitations, the Court reasoned that the company representative's statements were inadmissible because the statements were not relevant to the facts of the accident and did not aid in constructing daughter's written statement. *Id.*

Some years later, this Court clarified and further limited the doctrine of verbal completeness in *Richardson v. State*, 324 Md. 611, 598 A.2d 180 (1991). Richardson was convicted following a bench trial of first-degree premeditated murder, felony murder, first and second-degree rape, first and second-degree sexual offense, and other related offenses. *Id.* at 613, 598 A.2d at 18. On appeal, he complained that statements elicited by the State during re-direct examination of a police detective, contained multiple levels of hearsay. *Id.* In addition to applying the test articulated in *Feigley*, the Court added the qualification that "where the remainder is incompetent, not merely as to form as in the case of secondary evidence or hearsay, but because of its prejudicial character then the trial judge should exclude if he finds that the danger of prejudice outweighs the explanatory value." *Id.* at 622–23, 598 A.2d at 185. Thus, the *Richardson* Court added the additional limitation that evidence admitted through the doctrine of verbal completeness may be excluded if the danger of prejudice outweighs its explanatory value. *Id.*

We again limited the common law doctrine of verbal completeness in *Conyers v. State*, 345 Md. 525, 693 A.2d 781 (1997). Unlike the call transcripts at issue here, which are a part of the same conversation, *Conyers* involved an attempt to admit exculpatory statements through the common law doctrine of verbal completeness that were made during a separate and distinct conversation from the statements elicited at trial. Conyers was

convicted of murdering his estranged girlfriend's mother and another man. *Conyers*, 345 Md. at 534, 693 A.2d at 781. At trial, during the State's examination of Conyers' estranged girlfriend, Monica Wilson, she testified that Conyers owned two handguns. *Id.* at 539, 693 A.2d at 787. Wilson was aware of the first handgun, but only learned of the second handgun during a telephone conversation with Conyers while he was incarcerated for the murders. *Id.* Wilson testified that Conyers stored one of the guns in a bag that was introduced into evidence. *Id.* at 539–40, 693 A.2d at 787. The testimony supported the State's theory that Conyers hid a gun on the evening of Wilson's mother's murder.

During the cross-examination of Wilson, counsel inquired about another conversation with Conyers, where Conyers stated that he gave his guns away prior to the occurrence of the two murders. *Id.* at 540, 693 A.2d at 788. Following the State's hearsay objection, Conyers argued that the separate statement was admissible pursuant to the doctrine of verbal completeness because "the court was required to admit this exculpatory hearsay statement to balance the effect of the inculpatory hearsay statements." *Id.* The *Conyers* Court again relied on *Feigley* but added that "[t]he doctrine of completeness allows, and under some circumstances fairness may require, a court to admit statements from separate conversations." *Id.* at 544, 693 A.2d at 790. Conyers' circumstance was not such a case. To the contrary, "[t]he doctrine of verbal completeness does not allow evidence that is otherwise inadmissible as hearsay to become admissible solely because it is derived from a single writing or conversation." *Id.* at 545 A.2d at 790.

29

Therefore, the rules outlined in *Feigley* provide the basis upon which this Court must limit evidence admitted pursuant to the doctrine of verbal completeness. *Richardson* orders that where the remaining evidence, if otherwise inadmissible, is more prejudicial than probative, a trial court may exclude the evidence. A reading of *Conyers* dictates that a statement does not have to be independently admissible. However, evidence that is otherwise inadmissible does not become admissible purely because it completes the thought or statement of the evidence offered pursuant to the doctrine of verbal completeness. Inadmissible evidence will only be admitted by the rule of completeness if it is particularly helpful in explaining a partial statement and that explanatory value is not substantially outweighed by the danger of unfair prejudice, waste of time, or confusion.

## *Analysis of Petitioner's Claims*

Petitioner argues that pursuant to the doctrine of verbal completeness, his right to admit the whole transcript of the calls was automatic. As is evident from the cases discussed *supra*, that simply is not the case. In Maryland, there are limitations on the doctrine as examined in *Feigley*, *Richardson*, and *Conyers*.

An application of *Feigley* does not yield error in the trial court's decision. *Feigley v. Baltimore Transit Co.* requires:

> [1] No utterance irrelevant to the issue is receivable;
> [2] No more of the remainder of the utterance than concerns the same subject, and is explanatory of the first part, is receivable;
> [3] The remainder thus received merely aids in the construction of the utterance as a whole, and is not in itself testimony.

211 Md. at 10, 124 A.2d at 827. (Emphasis omitted). Examining the first part of the rule, although portions of the remaining transcripts are relevant, it was just as reasonable to conclude that the remaining transcripts did not explain or aid in constructing the redacted portions admitted by the State. Evidence is relevant if it has any tendency to make any fact more or less probable in determination of the action. Md. Rule 5-401. We have opined that having "any tendency" to make "any fact" more or less probable, is a very low bar to meet. *Williams v. State*, 457 Md. 551, 564, 79 A.3d 1006, 1013 (2018) (quoting *State v. Simms*, 420 Md. 705, 727, 25 A.3d 144, 157 (2011)). Portions of the remaining jailhouse telephone transcripts relate to securing an attorney for S.L., aspects of Petitioner and S.L.'s children's' lives, and Petitioner's financial woes. This information could reasonably be relevant to Petitioner's motive or S.L.'s trustworthiness, either of which could make facts at issue more or less probable in Petitioner's rape trial. Thus, a review of the remainder of the transcript makes clear that the phone calls may have been legally relevant.

Assessing the second rule from *Feigley*, the trial court did not abuse its discretion in determining that the remaining telephone calls did not concern the same subject or help to explain the partial statements. The redacted call transcript admitted by the State involved Petitioner's scheme to have his family take care of S.L. to convince her to recant her allegations. The remainder of the telephone call does not directly discuss the scheme, but references his finances, an upcoming bond hearing, and the presiding judge. Petitioner has not explained how his particular interest in the bond hearing explains or interprets his statements that helping S.L and the children would motivate S.L to recant her statements

31

incriminating him. Even if Petitioner meant that helping S.L. would cause her to recant at the time of the bond hearing, his statement still supports the State's theory that he attempted to persuade a change in her testimony. The trial court reasoned that these were not the same subject and would not explain the admitted portions of the transcript, but rather, may tend to confuse the jury. As explained by the Court of Special Appeals, "[t]he trial judge here construed the subject of the audio excerpts narrowly as statements pertaining to persuading S.L. to recant. [Petitioner] would have us construe the same subject broadly to encompass the whole range of topics." *Otto*, 2017 WL 2839150 at \*8. Because reasonable minds could differ on the scope of the subject of the calls and the explanatory nature, abuse of discretion will not lie.

The third part of the rule that the remaining evidence "merely aids in construction of the utterance as a whole," is incorporated within the second rule's requirement that the remaining evidence be "explanatory of the first part…." *Feigley*, 211 Md. at 10, 124 A.2d at 827. (Emphasis omitted). The added restriction that the remaining evidence "is not in itself testimony," dictates that, had remainder of the transcripts been admitted, the remainder could only be used to explain the already admitted partial statements. *Id.* (Emphasis omitted).

The parties disagree regarding the independent admissibility of the remaining telephone calls. At trial, Petitioner argued that the trial court had no discretion to exclude the remaining telephone transcript because it was not independently admissible. Petitioner also conceded that the remaining telephone transcripts contained hearsay-within-hearsay,

32

and that those statements would be redacted if the trial court ultimately admitted the evidence. Respondent asserts that the trial court did not deny Petitioner's request to admit the entire call because it was not otherwise admissible.

Petitioner requests that this Court adopt the analysis established in *United States v. Bailey*, No. CR PWG-16-0246, 2017 WL 2276849 (D. Md. May 25, 2017), an unreported opinion from the United States District Court for the District of Maryland, authored by Judge Paul W. Grimm. *Bailey* endeavored to resolve the split in authority which arose in federal circuits regarding whether Federal Rule of Evidence 106 requires that evidence admitted under the doctrine of verbal completeness be independently admissible. Petitioner highlights that the noteworthy points that this Court should follow involve *Bailey's* premise that the common law completeness doctrine permitted introduction of otherwise admissible evidence, and a suggestion of a nine factor test on whether ordinarily inadmissible hearsay should be introduced under Federal Rule of Evidence 106. *See Bailey*, 2017 WL 2276849 at *3, *6. Contrasting this Court's decision in *Conyers* with *Bailey*, Petitioner asserts that *Conyers* was not well-reasoned and that any discussion in *Conyers* about independently admissible evidence should be construed as *dicta* because it was not the primary issue before this Court.

Petitioner's reliance on *Bailey*, and criticism of *Conyers,* overlooks the fact that the trial judge did not exclude the remaining telephone calls in this case on the grounds of

independent inadmissibility.[8]  The trial judge's colloquy with counsel demonstrates a

consideration of common law precedent requiring that evidence admitted pursuant to the

doctrine of verbal completeness, aid in construing or explaining the admitted evidence.

While discussing his reasoning, the trial judge explained that in State's Exhibit 96 the focus

is that "[Petitioner] wants her to recant so he can get out so this whole thing can get away

- - go away…. I don't believe he is talking about recant in any aspect other than getting her

to recant her testimony that kicked this whole thing off."  When addressing Petitioner's

claim that the remaining telephone calls would aid in demonstrating to the jury that

Petitioner was referring to an upcoming bond hearing, the trial judge reasoned Petitioner's

comments were not made because "[h]e is worried about the fact that she is going to testify

[against] him and recant doesn't mean anything other than recant what she said."  The trial

judge makes no reference to independent admissibility.  Rather, the trial judge indicates

that the remaining telephone calls do not illuminate Petitioner's statements regarding

efforts to get S.L. to recant.  When the State raised the issue of hearsay contained within

---

[8] Petitioner also requests that this Court follow the analysis utilized in *Churchfield v. State*, 137 Md. App. 668, 769 A.2d 313 (2001).  In *Churchfield*, the appellant argued that "because the State was allowed to introduce part of a confession or admission into evidence he should have, in turn, been allowed to introduce the remainder of that statement, in which he denied having sexual relations with [his daughter]" pursuant to the common law doctrine of verbal completeness.  *Id.* at 691–92, 769 A.2d at 326–27.  Recognizing that the statements at issue in *Churchfield* were made in two separate conversations, the Court opined that *Conyers* makes clear the remaining statements "must be 'the remaining part of a *single* writing or conversation' for the doctrine to apply."  *Id.* at 693, 769 A.2d at 328 (quoting *Conyers*, 345 Md. at 542, 693 A.2d 781).  For the same reasons that Petitioner's criticism of *Conyers* fails, his reliance on *Churchfield* is improper.  The non-redacted call transcript is part of the same writing, but as we have concluded, the non-redacted telephone calls did not meet *Feigley's* foundational test.

the remaining telephone calls, Petitioner's counsel agreed that those statements could be redacted. Therefore, Petitioner's reliance on *Bailey* is misplaced and is not persuasive on overcoming the common law precedent in this State regarding the common law doctrine of verbal completeness.

## CONCLUSION

As illustrated *supra*, each decision analyzing the common law doctrine of verbal completeness subsequent to *Feigley* narrows the scope of the evidence that can be admitted. Contrary to Petitioner's contention, the right is not automatic, but must be considered in light of what has already been admitted. A party seeking to admit evidence pursuant to the doctrine of verbal completeness must still satisfy *Feigley's* foundational test. The trial judge in this case analyzed, on the record, that Petitioner's sentiment that he would be "screwed" if S.L. did not recant, were not clarified through admission of the remaining transcripts. Although the trial judge construed the subject and content of the non-redacted call transcript more narrowly than Petitioner proposes, it was not an abuse of discretion to exclude the remaining telephone calls.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS IS AFFIRMED. COSTS TO BE PAID BY PETITIONER.**

Judge Watts joins in judgment only.

35